Nos. 00-226, 00-227 and 00-340

IN THE SUPREME COURT OF THE STATE OF MONTANA

2002 MT 259

POWDER RIVER COUNTY; BIG HORN COUNTY;
PHILLIPS COUNTY; ROSEBUD COUNTY; BUD
FLETCHER, a taxpayer in Powder River County; and
JAMES V. SCHIFFER, a taxpayer in Rosebud County,

        Plaintiffs and Appellants,

    v.

THE STATE OF MONTANA and THE DEPARTMENT
OF REVENUE OF THE STATE OF MONTANA,

        Defendants and Respondents,

    and

WESTERN ENERGY COMPANY, et al.,

        Intervenors and Respondents.

APPEAL FROM:    District Court of the Sixteenth Judicial District,
                In and for the County of Rosebud,
                Honorable John W. Larson, Judge Presiding

COUNSEL OF RECORD:

        For Appellants:

                Larry G. Schuster (argued), Attorney at Law, Great Falls, Montana

        For Respondents:

                Stephen R. McCue (argued) and David Woodgerd, Tax Counsel,
                Helena, Montana (Department of Revenue)

                Elizabeth S. Baker (argued), Hughes, Kellner, Sullivan & Alke,
                Helena, Montana (Intervenors)

                  Heard and Submitted:  May 24, 2001
                                Decided:  November 21, 2002

Filed:

                  _____
                            Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    Plaintiffs, four counties and two individual taxpayers, instituted two declaratory judgment actions in 1993, challenging the validity of the local government severance tax on net proceeds of oil and natural gas and of the coal gross proceeds tax established by House Bill 28 (HB 28), passed by the Legislature in Special Session in June 1989.  The two actions, one filed in Rosebud County (Supreme Court Cause No. 00-226) and the other in Powder River County (Supreme Court Cause No. 00-340), contained identical parties and verbatim Complaints, and the Sixteenth Judicial District Court, Powder River County, consolidated both actions.  Venue was subsequently changed to Rosebud County.  In 1996, the identical Plaintiffs filed the third action in Rosebud County (Supreme Court Cause No. 00-227), challenging on similar grounds the validity of Senate Bill 412 (SB 412), enacted as the Montana Oil and Gas Production Tax Act of 1995, § 15-36-301, et seq., MCA (1995), asserting that the 1995 legislation carried forth the same tax discrimination commenced under HB 28.  The District Court did not consolidate the third action with the previous two.

¶2    The District Court in Rosebud County entered three judgments in consolidated actions 00-226/00-340.  It granted partial summary judgment in favor of the Defendants and against the Plaintiff Counties on numerous issues in September 1996.  In March 2000, after a bench trial, the District Court entered judgment in favor of the Defendants and against Big Horn County on the County's impairment of obligation of contract claim.  It subsequently

2

granted summary judgment on all remaining issues in favor of the Defendants and against the Individual Plaintiffs in May 2000. In the 1996 action (00-227), the District Court granted summary judgment in favor of Defendants on all issues in March 2000.

¶3 The above actions are consolidated for purposes of disposition on appeal as the named parties and counsel are identical, because each action challenges the Legislature's constitutional authority to change the type and amount of taxes collected to fund local governments, and each action arose out of the system of taxation for coal, oil and gas adopted by the Legislature in HB 28 and SB 412.

*ISSUES*

¶4 We restate the issues on appeal as follows:

¶5 **1. Did the District Court err in concluding that classification of property for taxation is not statutorily or constitutionally mandated in Montana?**

¶6 **2. Did the District Court err in concluding that HB 28 and SB 412 did not violate the Appellants' rights to equal protection and due process of the law?**

¶7 **3. Did the District Court err in its Findings of Fact and Conclusions of Law regarding Big Horn County's impairment of obligation of contract claim?**

¶8 **4. Did the Department of Revenue's activities in "Project 95" constitute legislation in contravention of the Separation of Powers Doctrine?**

*BACKGROUND*

¶9 In 1989, this Court decided *Helena Elementary School Dist. No. 1 v. State* (1989), 236 Mont. 44, 769 P.2d 684. In *Helena* we held that Montana's system of public school funding then in effect

3

violated Article X of the Montana Constitution because it did not provide an equal educational opportunity to public school students.

¶10  In response to our ruling, the Legislature met in special session in June 1989, to revise the State's system for public school funding.  Various bills were considered and the Legislature eventually enacted HB 28 into law as Chapter 11, June Special Session Laws of 1989.  The Legislature amended various parts of HB 28 in the May 1990 Special Session and in regular session in 1991.  The tax laws that the Plaintiffs now challenge were an integral part of HB 28.

¶11  Prior to the passage of HB 28, annual coal gross proceeds were classified as Class Two property under Montana's statutory classification scheme and taxed at 45 percent of value in addition to being subject to local mill levies.  The coal gross proceeds tax, therefore, varied from year to year and from county to county.

¶12  Prior to HB 28, net proceeds of oil and natural gas were classified as Class One property.  The net proceeds tax on oil and natural gas wells drilled prior to June 30, 1985, were also subject to local mill levies.  This net proceeds tax also varied from year to year and from county to county.   The net proceeds on wells drilled after June 30, 1985, were not subject to local mill levies and were taxed at a flat rate of 7 percent for oil and 12 percent for natural gas, regardless of the county in which the well was located.

4

¶13 HB 28 imposed numerous tax changes in support of state equalization aid funding. Among these changes, HB 28 imposed a 40 mill statewide levy on each county on all taxable property within the state. It also increased county elementary levy from 28 mills to 33 mills and increased the levy for high schools from 17 to 22 mills, for a total statewide increase on all taxable property of 50 mills.

¶14 HB 28 exempted coal gross proceeds and oil and gas net proceeds from the 50 mill statewide levy and from local mill levies. In lieu of the net proceeds tax on oil and gas, HB 28 imposed a new local government severance tax (LGST) on the gross taxable value of oil and natural gas, other than on new production[1]–a LGST of 8.4 percent on oil and a LGST of 15.25 percent on gas–regardless of the county in which the well was located..

¶15 HB 28 also removed the power of counties to levy or assess any mills against the reported coal gross proceeds. Rather, HB 28 imposed a statewide levy of 5 percent against the value of reported coal gross proceeds. The taxes collected from the new LGST on oil

---

[1] "The term 'new production' means the production of natural gas, petroleum, or other crude or mineral oil from any well drilled after June 30, 1985, or that has not produced natural gas, petroleum, or other crude or mineral oil during the 5 years immediately preceding the first month of qualified new production." Section 15-23-601(2), MCA (1991).

and natural gas and from reported coal gross proceeds were to be distributed in the same manner as property taxes in support of school funding equalization aid.

¶16 In 1993, the Plaintiffs filed identical complaints, one in Powder River County and the other in Rosebud County, challenging HB 28. The Plaintiffs specifically challenged the Legislature's decision to tax coal gross proceeds and oil and gas net proceeds in support of school equalization funding via a lower fixed tax rate than the statewide 50 mill increase imposed on all other taxable property in the state. The County Plaintiffs focused their efforts in Rosebud County, challenging the new tax system as an unconstitutional impairment of the obligation of contract related to the 1984 Big Horn County General Obligation Bonds (Bond Claim). The Individual Plaintiffs focused their efforts in Powder River County, challenging the new taxation, as applied to them, on equal protection and due process grounds. The District Court, Judge Rapkoch presiding, consolidated the two matters and, on December 14, 1993, granted leave for eight producers of oil and gas and six producers of coal to intervene in the action (Intervenors).

¶17 In the Complaint, the Plaintiffs requested that the District Court declare unconstitutional the LGST on oil and gas production and the fixed tax rate on coal gross proceeds, and, in lieu of these taxes, requested that the District Court extend the newly enacted statewide and school mills to include all oil and gas production properties and coal gross proceeds for the tax years of 1990 through the time of filing the Complaint. The Plaintiffs also

6

requested that the District Court, as a remedial measure, order that the repealed tax statutes for net proceeds of oil and natural gas and for coal gross proceeds be enforced anew for the same tax years at issue.

¶18 The 1995 Legislature, in regular session, repealed both the state and local government severance taxes on oil and natural gas, §§ 15-36-101, et seq., MCA (1993), as well as the oil and gas net proceeds tax, §§ 15-23-601 through -631, MCA (1993), among other oil and gas taxes similarly repealed. The Legislature enacted SB 412 and replaced these various repealed taxes with the Oil and Gas Production Tax Act (Production Act)–a single production tax based on the type of well and type of production–which became effective on January 1, 1996. Section 15-36-301, et seq., MCA (1995).

¶19 In February 1996, the same plaintiffs who initiated the first two actions filed a third action against the same defendants, alleging that the Production Act did nothing to remedy the flaws in HB 28 regarding oil and gas production, but carried forth the same "flat tax" discrimination and unconstitutional tax exemptions for oil and gas as originally enacted in HB 28.

¶20 The Department of Revenue and the Intervenors filed motions for summary judgment, and the District Court, on September 11, 1996, entered partial summary judgment against the Counties on all but one of the Counties' constitutional claims. The District Court preserved for trial only the Big Horn County's obligations of contract claims and preserved for later ruling the constitutional challenges of the Individual Plaintiffs.

7

¶21 The District Court held a bench trial on September 14 and 15, 1999, and entered its Findings and Conclusions on March 1, 2000, concluding that the enactment of HB 28 was a valid and constitutional exercise of legislative authority and did not substantially impair Big Horn County's obligation of contract with its bondholders.

¶22 The District Court entered an order resolving the Individual Plaintiffs' challenges to HB 28 in May 2000, concluding that the Individual Plaintiffs essentially voiced identical constitutional objections as the Counties and neither presented nor argued legal or factual issues distinct from the Counties' objections. The District Court granted summary judgment in favor of the Defendants and against the Individual Plaintiffs on all claims.

¶23 Finally, the District Court granted summary judgment in favor of the Defendants against all Plaintiffs in the third action, concluding that SB 412, the Production Act, was constitutional.

*DISCUSSION*

¶24 As a preliminary matter, we address the Respondents' assertion that the District Court's order of May 2000, adjudicating the claims of the Individual Plaintiffs, is improperly appealed, and thus improperly before this Court. Although the Rosebud County action (Supreme Court Cause No. 00-226; Big Horn County's Bond Claim) and the Powder River action (Supreme Court Cause No. 00-340; Individual Plaintiffs' claims) were consolidated into a single action by the District Court, the District Court adjudicated the former via bench trial, findings and conclusions entered in March

8

2000, and it adjudicated the latter via a grant of summary judgment in May 2000.

¶25 Prior to the District Court's May 2000, order, the Appellants, on April 24, 2000, filed a notice of appeal from the District Court's March 2000, judgment, on Big Horn County's Bond Claim. Prior to filing their notice of appeal, on April 11, 2000, the Appellants sought a writ of mandamus from this Court to compel the District Court to enter a decision on the remaining issues involving the claims of the Individual Plaintiffs. This Court summarily denied the writ on April 25, 2000.

¶26 In May 2000, the District Court entered its findings and conclusions on the Individual Plaintiffs' claims, claims that the District Court had explicitly reserved for later ruling. The Appellants thereafter filed a second notice of appeal. The Respondents argue that the Appellants' initial, April 24, 2000, notice of appeal, divested the District Court of jurisdiction to enter any further judgments or orders, and that the District Court's order of May 2000, is thus improperly before this Court.

¶27 It is axiomatic that when notice of appeal has been filed, jurisdiction passes from the District Court and vests in the Supreme Court. *Powers Mfg. Co. v. Leon Jacobs Enterprises* (1985), 216 Mont. 407, 411, 701 P.2d 1377, 1380 (citation omitted). After notice has been filed, the District Court retains jurisdiction only to correct clerical errors and jurisdiction over ancillary matters, as well as some jurisdiction over matters involving appeal such as undertaking of costs, stay of judgment, and matters involving

9

transcript on appeal. *Powers*, 216 Mont. at 411-12, 701 P.2d at 1380 (citations omitted).

¶28 It is also axiomatic, however, as stated in Rule 1, M.R.App.P., that an appeal can be taken only from a final judgment or special order made after final judgment. *In the Matter of B.P.*, 2000 MT 39, ¶ 15, 298 Mont. 287, ¶ 15, 995 P.2d 982, ¶ 15; *Kirchner v. Western Montana Regional Comm. Health Ctr.* (1993), 261 Mont. 227, 229, 861 P.2d 927, 928-29. "A final judgment is one which constitutes a final determination of the rights of the parties; any judgment, order or decree leaving matters undetermined is interlocutory in nature and not a final judgment for purposes of appeal." *In the Matter of B.P.*, ¶ 15 (citing *Litigation Relating to Riot* (1997), 283 Mont. 277, 280, 939 P.2d 1013, 1015-16); *see also Howard Gault & Son, Inc. v. First Nat. Bank of Hereford* (Tex.Civ.App. 1975), 523 S.W.2d 496, 498 (noting that "[a] judgment is considered final only if it determines the rights of the parties and disposes of all of the issues involved so that no future action by the court will be necessary in order to settle and determine the entire controversy").

¶29 In the present controversy, the District Court consolidated the Counties' and the Individual Plaintiffs' claims together into a single action. Because the District Court's March 2000, order, adjudicating Big Horn County's Bond Claim left undetermined the issues of the Individual Plaintiffs, the appeal taken therefrom was interlocutory in nature, because settling and determining the

entire controversy, as consolidated, required further adjudication by the District Court.

¶30 We thus find no merit in the Respondent's assertion that the Individual Plaintiffs' claims are not properly before this Court. To the contrary, we conclude that only after the May 2000, order of the District Court, was this appeal properly taken from the final judgment of the consolidated actions. The Appellants' April 24, 2000, notice of appeal, was premature, and pursuant to Rule 1(b), subsection (2), M.R.App.P., improperly sought to appeal an interlocutory order.

¶31 We thus hold that the Individual Plaintiffs' claims, in Supreme Court Cause No. 00-340, are properly before this Court.

¶32 **1.    Did the District Court err in concluding that classification of property for taxation is not statutorily or constitutionally mandated in Montana?**

¶33  At the heart of the Appellants' challenge to the validity of HB 28 and SB 412 is the greater tax burden for school equalization aid placed on all classified taxable property as compared to the burden placed on coal, oil and natural gas for the same aid.  The Appellants assign error to this based upon a number of statutory and constitutional grounds.  The Appellants assert that HB 28 and SB 412 are invalid based upon their inconsistency with § 15-6-101, MCA, that they violate Article VIII, Section 5(1)(c), of the Montana Constitution, and that they are inconsistent with principles related to property taxation which have been followed by this Court for more than eighty years.

¶34  Specifically, the Appellants assert that § 15-6-101, MCA, requires the Legislature to levy taxes on property exclusively via Montana's statutory tax classification system.  That section provides:

> **Property subject to taxation – classification.**  (1) All property in this state is subject to taxation, except as provided otherwise.  (2) For the purpose of taxation, the taxable property in this state shall be classified in accordance with this part.

The Appellants assert that because HB 28 and SB 412  provided for taxation of coal gross proceeds and the net proceeds of oil and gas without creating and placing said property into a new class or reclassifying the property into an existing class, that both laws are invalid merely by their inconsistency with § 15-6-101, MCA.

¶35 Second, the Appellants assert that Article VIII, Section 5(1)(c), of the Montana Constitution limits the Legislature to exempting only classes of property from taxation. Section 5(1)(c) provides:

> **Property tax exemptions.** (1) The Legislature may exempt from taxation:
> . . .
> (c) Any other classes of property.

Specifically, the Appellants assert that Section 5(1)(c) requires the Legislature to classify property prior to enacting an exemption for that property. Further, because this section speaks only of classes, they assert that any exemption must be a "full" class exemption, exempting a particular class from any and all taxation.

¶36 Interpreting § 15-6-101, MCA, together with Article VIII, Section 5(1)(c), the Appellants assert that coal, oil and gas could only have been properly taxed or exempted from taxation if the property was first statutorily classified and then fully exempted, as a class, from a particular area of taxation. In the instant case, HB 28 removed coal, oil and gas from their original classification and imposed a fixed tax rate on coal gross proceeds and net proceeds of oil and gas without creating a new class for the property and without reclassifying the property into an existing class. HB 28 then exempted these proceeds from the statewide increase of 50 mills on all taxable property for state equalization aid and further removed these proceeds from the reach of local mill levies.

13

¶37 Because these proceeds from now unclassified property still contributed to state equalization aid apart from the 50 mill increase, the Appellants assert that this property was accorded, as they characterize it, a "partial" tax exemption rather than the constitutionally required "full" tax exemption. Further, as a full tax exemption was not accorded the property, the Appellants characterize this "partial" tax exemption as holding coal, oil and gas "harmless" from the 50 mill increase, while all other taxable property in the state is "harmed" by contributing to state equalization aid with the increased statewide and local mills.

¶38 Finally, because HB 28 and SB 412 imposed a fixed tax rate on coal, oil and gas, exempting these proceeds from the mill increase without classifying or reclassifying the property, the Appellants assert that HB 28 imposed a "flat tax system" on this property, contrary not only to the requirements of § 15-6-101, MCA, and Article VIII, Section 5(1)(c), of the Montana Constitution, but also in contravention to this Court's eighty year old rejection of "uniformity" of taxation. The principle of uniformity of taxation, they argue, was rejected by this Court in 1919, and by comparison, urge this Court to reject the "flat tax system" imposed by HB 28 and SB 412 just as it has rejected uniformity of taxation. It is with this final argument that we begin our analysis, as it will provide a framework for analyzing the current statutory taxation scheme and the constitutional limitations placed upon the Legislature by Montana's 1972 Constitution.

    *A.    Uniformity of Taxation*

14

¶39 The Appellants contend that in the 1919 case of *Hilger v. Moore* (1919), 56 Mont. 146, 182 P. 477, this Court rejected uniformity of taxation in favor of a system of taxation based upon classification, and that the framers of our 1972 Constitution joined in rejecting uniformity when they deliberately removed the two uniformity clauses as they existed in the 1889 Montana Constitution. They assert that Montana's tax classification system imposes widely diverse effective tax rates via classification and local mill levies, and that a "flat tax system," or "uniformity" of taxation, is inconsistent with the classification system. Then, without distinction, the Appellants assert the contrary, that although this Court and the framers of our 1972 Constitution rejected uniformity, the framers also "viewed the concept of uniformity to be secured by Equal Protection of the Law . . . ." To understand the Appellants' seemingly contrary assertions, we begin with the genesis of Montana's tax classification system and the concept of uniformity under Montana's 1889 and 1972 Constitutions.

¶40 Initially, we recognize that any restraint on the power of the legislature to impose taxation has its uttermost source in the Constitution, as the power to tax is inherent in the sovereign state and requires no grant of authority.[2] As we have previously

---

[2]Conversely, the government of the United States is one of *enumerated* powers, powers given by "the People of the United States." See the preamble to the United States Constitution. "In this respect [the United States Constitution] differs from the constitutions of the several States, which are not grants of powers to the States, but which apportion and impose restrictions upon the powers which the States inherently possess." 1 Cooley,

held, the Montana Constitution serves only as a limitation on the power of the legislature to tax. *State v. Toomey* (1958), 135 Mont. 35, 43, 335 P.2d 1051, 1055; *State ex rel. Tillman v. District Court* (1936), 101 Mont. 176, 181, 53 P.2d 107, 110; *Hilger*, 56 Mont. at 163-64, 182 P. at 479. One such limitation is that the legislature must enact general tax laws for the purpose of levying taxes. Art. VIII, Sec. 1, Mont. Const (1972). "It is a basic premise of the law of taxation that the foundation for levying and assessing a tax depends upon the existence of a valid legislative act specifically designating the imposition of the tax. Nothing is taxable unless clearly authorized by statute." *Connick v. Judge* (1975), 167 Mont. 357, 361, 538 P.2d 1024, 1027 (citing *Swartz v. Berg* (1966), 147 Mont. 178, 181-82, 411 P.2d 736, 738). The legislature, therefore, by the enactment of statute, possesses all powers of law-making in this state except only in so far as those powers are curtailed in the Constitution. "He who seeks to limit the power of the lawmakers must be able to point out the particular provision of the Constitution which contains the limitation expressed in no uncertain terms." *Hilger*, 56 Mont. at 163, 182 P.

---

*Constitutional Limitations*, 8th ed., pp. 11-12 (1927).    *Also see Martin v. Hunter's Lessee* (1816), 14 U.S. 304, 4 L.Ed. 97: "**[I]t is perfectly clear that the sovereign powers vested in the state governments, by their respective constitutions, remained unaltered and unimpaired, except so far as they were granted to the government of the United States. These deductions do not rest upon general reasoning, plain and obvious as they seem to be. They have been positively recognised by one of the articles in amendment of the constitution, which declares, that 'the powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the *states* respectively, or *to the people*.' The government, then, of the United States, can claim no powers which are not granted to it by the constitution, and the powers actually granted, must be such as are expressly given, or given by necessary implication.**" 14 U.S. at 325-26, 4 L.Ed. at 102.

16

at 479. "To determine, therefore, whether a statute is valid, it is not necessary to seek the source of the power to enact it." *Toomey,* 135 Mont. at 43, 335 P.2d at 1055 (citations omitted).

¶41 Important in our discussion of the Appellants' challenge is the fact that neither Montana's 1889 or our current constitution contains any provision that either requires or prohibits a tax classification system. In fact, no provision in either constitution limited the Legislature to one specific system of taxation, but merely contained provisions which limit what the Legislature may accomplish or enact within any given system of taxation.

¶42 The Legislature enacted Montana's first classification system for taxable property in 1919 by Chapter 51 of the Laws of 1919, and it was challenged that same year by the actions of the County Treasurer of Lewis and Clark County, W.A. Moore (Moore). According to this new system, all property not otherwise exempted by statute or by the Constitution was grouped into seven classes to be taxed according to a fixed percentage of the "true and full value" of the property–ranging from 100 percent of value of Class One property to 7 percent of value of Class Five property.

¶43 After the enactment of the classification system of taxation, Moore continued to compute taxes in Lewis and Clark County based upon a property's fully assessed value rather than computing the taxes based upon a fixed percentage of its fully assessed value under the new classification system. *Hilger*, 56 Mont. at 162, 182 P. at 478-79. David Hilger (Hilger) owned personal property within

17

Lewis and Clark County which undisputedly belonged to Class Two property, and as such, only 20 percent of its true and full value was to be used as a basis for the imposition of taxes. *Hilger*, 56 Mont. at 162-63, 182 P. at 478-79. Moore's computation of Hilger's property tax based upon 100 percent of its true and full value prompted Hilger to bring suit. Moore argued that two provisions of the Montana Constitution precluded a classification system for taxable property, specifically, that classification violated the Constitution's uniformity clauses in Article XII, Sections 1 and 11, and denied Montana's taxpayers equal protection under the Fourteenth Amendment of the United States Constitution.

¶44 Article XII, Section 1, of the 1889 Constitution provided:

> The necessary revenue for the support and maintenance of the state shall be provided by the legislative assembly, which shall levy a *uniform rate of assessment and taxation* and shall prescribe such regulations as shall secure a just valuation for taxation of all property, except that specially provided for in this article . . . . [Emphasis supplied.]

Article XII, Section 11, of the 1889 Constitution provided:

> Taxes shall be levied and collected by general laws and for public purposes only. They shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax.

¶45 The *Hilger* Court provided a distinction which is important in understanding the Appellants' contrary assertions noted above. "Uniformity" in taxation systems exists in three forms. Two forms, arising from the above-cited provisions of the 1889 Constitution and discussed later herein, co-exist within a tax classification system. The third form is entirely contrary to a classification system. The latter can be referred to as the "uniformity rule of

18

general property taxation," or "uniform *ad valorem* system." *Hilger*, 56 Mont. at 164, 182 P. at 479. This system of taxation requires that all taxpayers owning property of the same assessed value would pay precisely the same amount of tax, without reference to the character of the property. Moore asserted that Article XII, Section 1, of the Montana Constitution not only precluded a classification system of taxation, but also, that Section 1 required the uniform *ad valorem* system.

¶46 The *Hilger* Court concluded that this type of uniformity, contrary to Moore's assertions, had never prevailed in Montana. *Hilger*, 56 Mont. at 171, 182 P. at 482. In upholding the newly enacted classification system, the *Hilger* Court stated that:

> This court has repeatedly laid down the doctrine that diversity of taxation [referring to a tax system of classification] . . . is not inconsistent with a perfect uniformity and equality of taxation in the proper sense of those terms; and that a system which imposes the same tax upon every species of property, irrespective of its nature or condition or class, will be destructive of the principle of uniformity and equality in taxation and of a just adaption of property to its burdens.

*Hilger*, 56 Mont. at 173, 182 P. at 483 (citing *Pacific Express Co. v. Seibert* (1892), 142 U.S. 339, 351, 35 L.Ed. 1035, 12 S.Ct. 250, 253).

¶47 Although adopting strong language from the United States Supreme Court, the *Hilger* Court opined that "experience alone will demonstrate" whether a classification system of taxation will meet its objective of fairly taxing property in proportion to its use, productivity, utility, and its general setting in the economic environment, and "realize the hopes of its advocates." *Hilger*, 56

19

Mont. at 173, 182 P. at 483. Thus, contrary to the characterization by the Appellants, the *Hilger* Court did not reject a uniform *ad valorem* system of taxation in favor of classification, but rather, held that such a uniform system was not required under the 1889 Constitution, and also recognized that a classification system of taxation was not prohibited, but permissible, under the 1889 Constitution, remaining subject, of course, to the Constitution's two uniformity clauses.

¶48 Interestingly, the *Hilger* Court needed to look no further than the Constitution for evidence that absolute uniformity did not prevail in Montana. The most notable example, Article XII, Section 3, of the 1889 Constitution, provided for limitations on taxation of mining property–what the Court called an "artificial and arbitrary rule for the assessment and taxation of certain mining property without reference to its actual cash value . . . ." *Hilger*, 56 Mont. at 171, 182 P. at 482. The Court had noted two years earlier that the purpose of Section 3 was to provide a special method for the assessment and taxation of mining property, because although "falling generally within the definition of 'property,' . . . [it] could not be justly dealt with by the method provided for other real property, and therefore must be valued and taxed by a method which would accomplish the desired result." *Northern Pacific Ry. Co. v. Musselshell County* (1917), 54 Mont. 96, 104, 169 P. 53, 55; reaffirmed in *State ex rel. Hinz v. Moody* (1924), 71 Mont. 473, 480, 230 P. 575, 578. In *State v. Camp Sing* (1896), 18 Mont. 128, 139-40, 44 P. 516, 517, the Court noted,

20

interestingly, that "[m]ines and mining claims in the state are liberally protected from what might be, perhaps, deemed excessive taxation."

¶49 However, the conclusion that the uniform *ad valorem* system of taxation was not required in Montana did not mean that the two uniformity clauses in the 1889 Constitution were somehow declared ineffective, as Appellants argue. The two uniformity clauses remained fully effective, continuing to limit the legislature's ability to tax notwithstanding the type of taxation system that may be enacted, whether it be a uniform *ad valorem* system or a statewide system of classification. In other words, Sections 1 and 11 continued to require uniformity within the new system of classification.

¶50 We turn then, to the concept of uniformity as it was required within a classified taxation system under the 1889 Constitution. Article XII, Section 1, provided in part that the legislature "shall levy a uniform rate of assessment and taxation" and "shall prescribe such regulations as shall secure a just valuation for all property, except that specially provided for in this article." The latter portion was construed by this Court in *Northwestern Mut. Life Ins. Co. v. Lewis & Clark County* (1903), 28 Mont. 484, 495, 72 P. 982, 985, and found to require universal taxation[3] of all

---

[3]Unlike Montana's current Constitution, its 1889 Constitution required that all property in the state be taxed. The requirement that all property be taxed–the requirement of "universal taxation"– is not an imposition of any particular system of taxation (e.g., classification of property). The requirement of universal taxation of all property merely removed from the Legislature any discretion to provide for tax-exempt

21

property unless an exemption was provided therefor within the Constitution itself. Regarding the former portion of Section 1, the *Hilger* Court found two distinct requirements regarding uniformity: uniformity both of *assessment* and of *taxation*. "Assessment was the process by which persons subject to taxation were listed, their property described, and its value ascertained and stated. Taxation consisted in determining the rate of levy and imposing it." *Hilger*, 56 Mont. at 165, 182 P. at 480.

¶51 The second uniformity clause, set forth in Article XII, Section 11, provided in part that taxes "shall be uniform on the same class of subjects within the territorial limits of the authority levying the tax." As previously noted, the Court concluded that rather than prohibiting the Legislature from enacting a classification system of taxation, this clause "contains a distinct recognition of the right to do so." *Hilger*, 56 Mont. at 168, 182 P. at 481.

¶52 Construing the two uniformity clauses together within a classified system, the following rule was gleaned therefrom: The Legislature shall prescribe a uniform mode of assessment as shall secure a just valuation of all taxable property and all taxes shall be uniform upon the same class of property. *Hilger*, 56 Mont. at 170, 182 P. at 481-82. In other words, in order to secure a just valuation of all property, the method of assessing value must be

property via statute. The only property exempt from taxation were those made expressly exempt by the Constitution itself.

22

uniform, and subsequently, after the property has been justly valued via a uniform method, property within the same class must be uniformly taxed, that is, taxed at the same percentage. *Hilger*, 56 Mont. at 170, 182 P. at 481-82. Clearly, uniformity in the form provided by the two uniformity clauses prevailed in Montana and remained effective constitutional limitations on the state's inherent power to tax.

¶53 Therefore, we cannot agree with the Appellants' contention that this Court rejected uniformity of taxation in *Hilger*. The question resolved in *Hilger* was whether Montana's 1889 Constitution permitted a tax classification system, not whether the Constitution prohibited uniform *ad valorem* taxation. And, even if the question in *Hilger* had been the latter, the constitutional limitation of uniformity of taxation was clearly expressed by Sections 1 and 11, and required uniformity in assessment and uniformity in taxation regardless of the enacted system of taxation. Classification survived constitutional scrutiny, but the new classification system remained subject to the two Article XII uniformity clauses.

¶54 We also do not agree with the Appellants that the framers of Montana's 1972 Constitution somehow "joined in rejecting uniformity of taxation" by deliberately excluding any uniformity clauses in the 1972 Constitution. The Revenue and Finance Committee eliminated all of Section 1 and the second sentence of Section 11 of the 1889 Constitution, thus removing the requirement of universal taxation of all property, and specifically recognizing that uniformity of taxation was already required and protected by

23

the Equal Protection clause of the Fourteenth Amendment, making unnecessary a specific constitutional limiting provision regarding uniformity of taxation. See Montana Const. Convention, *Revenue and Finance Committee Proposal on Const. Revision*, Vol. II, pp. 579-80, 582. Contrary to the Appellants' assertion, uniformity was not rejected. It was specifically recognized as protected by the United States Constitution.

¶55 In urging this Court to reject uniformity in any form wherever it may occur, the Appellants attempt to draw a parallel between the uniform *ad valorem* system and the fixed tax rates on coal, oil and gas imposed by HB 28 and SB 412, and invite this Court to reject this "uniformity of taxation" on these extractive minerals just as this Court "rejected" the uniform *ad valorem* system in *Hilger.* As already established herein, the *Hilger* holding did not reject the *ad valorem* system. Further, it should be clear at this point that there is no meaningful comparison between absolute statewide uniformity of taxation based solely on assessed value and the imposition of a statewide fixed percentage rate of taxation on one or two types of property. There is no parallel between a statewide uniform *ad valorem* system and a statewide fixed percentage rate on property in a classified system, as an equal protection violation in the former will have little similarity to an equal protection violation in the latter. Addressing the issue before it, the *Hilger* Court found no equal protection violation in the classified property system. "While it is possible to lay the burdens of taxation so unevenly as to deprive some taxpayers of the equal

24

protection of the law, the mere fact that property is classified for the purpose of taxation does not bring the statute classifying it within the inhibition of the Fourteenth Amendment." *Hilger*, 56 Mont. at 174, 182 P. at 483.

¶56  This Court's "rejection" in *Hilger* of the uniform *ad valorem* system was no more than a recognition that Montana's 1889 Constitution did not require such a taxation system.  Montana's Constitution neither limited the Legislature to the uniform *ad valorem* system nor to any other system, but specifically acknowledged in Article XII, Section 11, the ability of the Legislature to enact a classification system.  Therefore, this Court's decision in *Hilger*, "rejecting" the uniform *ad valorem* system of taxation, does not require a similar rejection of HB 28's or SB 412's imposition of a fixed percentage rate on coal gross proceeds and net proceeds of oil and natural gas, nor does this suggested comparison of the two raise the specter of an equal protection violation, as it is nothing more than a suggested comparison of two entirely dissimilar methods of taxation.

  B.    *Statutory Inconsistency*

¶57  With this background, we turn now to the Appellants' argument that HB 28 and SB 412 are invalid based upon their inconsistency with § 15-6-101, MCA.  The Appellants acknowledge that Montana's classification scheme is statutory and not required by Montana's Constitution, but direct this Court to *Allegheny Pittsburgh Coal Co. v. County Com'n of Webster County* (1989), 488 U.S. 336, 109 S.Ct. 633, 102 L.Ed.2d 688, as an example of a state failing to

25

apply the state's tax law system to certain types of property, thereby violating the Fourteenth Amendment Equal Protection clause.

¶58   In *Allegheny*, the county tax assessor assessed the property of Allegheny and its successors at roughly eight to thirty-five times more than comparable neighboring property for a period of more than ten years between 1975 and 1986, consistently undervaluing the similarly situated neighboring property. *Allegheny*, 488 U.S. at 341, 109 S.Ct. at 637, 102 L.Ed.2d at 695-96.   The county assessor's sole method of appraisal was to fix the appraised value at the declared consideration at which the property last sold. Allegheny and its successors were subjected to higher and higher appraised value each time the property was sold.   The assessor made adjustments in the assessments of property not recently sold, but the adjustments were minimal and resulted in unequal taxation between the similarly situated properties.

¶59 The United States Supreme Court held that this practice resulted in gross disparities in the assessed value of generally comparable property and therefore denied Allegheny and its successors equal protection of the laws guaranteed by the Fourteenth Amendment.   *Allegheny*, 488 U.S. at 338, 109 S.Ct. at 635, 102 L.Ed.2d at 693.   The Supreme Court referenced West Virginia's constitutional uniformity requirement, but made no mention of West Virginia's state law system of taxation.   Regarding the county assessor's method of assessing appraised value, the Supreme Court merely clarified that no particular method was

26

required, stating that where "two methods are used to assess property in the same class [it] is, without more, of no constitutional moment." *Allegheny*, 488 U.S. at 343, 109 S.Ct. at 637, 102 L.Ed.2d at 697. The fulcrum of the equal protection violation was merely that "[t]he county's adjustments to the assessments of property not recently sold [were] too small to seasonably dissipate the remaining disparity between these assessments and the assessments based on a recent purchase price." *Allegheny*, 488 U.S. at 344, 109 S.Ct. at 638, 102 L.Ed.2d at 697.

¶60 We find that *Allegheny* is of no precedential value on the issue raised by the Appellants, as it does not speak of or hold that West Virginia failed to properly apply any statutorily mandated state law system of taxation. We are left, therefore, merely with the question of whether HB 28 or SB 412 are invalid based solely upon an inconsistency with § 15-6-101, MCA.

¶61 As noted above, § 15-6-101, MCA, provides that, for purposes of taxation, taxable property in this state shall be classified in accordance with said part. Coal gross proceeds and net proceeds of oil and gas, however, were not statutorily classified pursuant to § 15-6-101, MCA, but specifically taxed according to the rates provided in the newly enacted statutes. *E.g.* §§ 15-23-607, 15-23-701, et seq., and 15-36-101, MCA (1991).

¶62 That the taxation of coal, oil and gas via particular statutes, absent classification, is in apparent conflict with the mandatory classification language of § 15-6-101, MCA, does not make the more particular provisions of the challenged statutes invalid.

27

As noted above, the Legislature is limited in its inherent power to tax only insofar as that power is limited by the Constitution, with one such limitation being the enactment of statutes to authorize taxation. *Connick*, 167 Mont. at 361, 538 P.2d at 1027; *Toomey*, 135 Mont. at 43, 335 P.2d at 1055; Art. VIII, Sec. 1, Mont. Const. (1972).

¶63 The Legislature's constitutional power to tax is not frustrated by the enactment of conflicting taxation statutes, as a conflict between two statutes is not a reason for one to invalidate the other. General rules of statutory construction provide that when a general and particular provision are inconsistent, the particular provision is superior to the general, so that a particular legislative intent will control a general intent to the extent that there is any opposition between them. Section 1-2-102, MCA. *State v. Placzkiewicz*, 2001 MT 254, ¶ 18, 307 Mont. 189, ¶ 18, 36 P.3d 934, ¶ 18; *In re Marriage of Kotecki*, 2000 MT 254, ¶ 14, 301 Mont. 460, ¶ 14, 10 P.3d 828, ¶ 14. "Particular expressions qualify those which are general." Section 1-3-225, MCA.

¶64 The conflict between the § 15-6-101, MCA, and the newly enacted statutes for the taxation of coal, oil, and natural gas, is subject to the same rules of statutory construction– the latter are the more particular and, therefore, superior to the former, as the latter control the specific taxation of coal, oil, and natural gas. *See Placzkiewicz*, ¶ 18 (holding that the specific statute of limitations for postconviction proceedings in Title 46, Chapter 21,

controls over the catch-all statute of limitations provisions in Title 27, Chapter 2); *see also Weston v. Cole* (1998), 233 Mont. 61, 63, 758 P.2d 289, 291 (holding that the shorter two-year period for filing a particular tort action such as assault and battery, § 27-2-204(3), MCA, controls over the more general three-year statute of limitations for tort actions in § 27-2-204(1), MCA).

¶65  Applying general rules of statutory construction, we conclude that the conflict existing between the statutory provisions in HB 28 and SB 412 and § 15-6-101, MCA, does not invalidate the more specific statutes taxing coal gross proceeds and net proceeds of oil and gas.[4]

C.    *"Partial" Tax Exemption*

¶66  Finally, the Appellants assert that Article VIII, Section 5(1)(c), of the 1972 Montana Constitution is a limiting provision, prohibiting the Legislature from exempting any property from taxation unless the property is first classified and then made fully exempt as a class.  In other words, the Appellants argue that the Legislature has the power to exempt coal, oil and gas from taxation, but it cannot merely remove the property from its

_____

[4] The Appellants also assert an equal protection violation because the state imposed § 15-6-101, MCA, the enabling statute for Montana's classification system, upon all taxable property in Montana other than coal gross proceeds and net proceeds of oil and natural gas.  This particular challenge to the statute will be addressed under Issue 2.

previous class and exempt it. They argue that the Legislature must insert one additional step–the Legislature should have created a new class, declared this property a part of that class, and then provide a full exemption to that class rather than allowing it to still contribute to state equalization aid funding for public schools. Because coal, oil and gas continued to contribute to school funding at a lower rate than statutorily classified property, the Appellants refer to the tax rate on these extractive minerals as a "partial" tax exemption. We now address, therefore, the question of whether the Legislature must statutorily classify property before creating an exemption for that property.

¶67 In arriving at a proper interpretation of any provision of our Constitution, we must bear in mind that the division of our Constitution into Chapters and Sections is a matter of convenience, and is not of significance in applying the rules of construction; and also that "every provision dealing with the same subject matter must be considered in determining the meaning of any expression whose meaning is in doubt." *State ex rel. Hinz v. Moody* (1924), 71 Mont. 473, 480-81, 230 P. 575, 578 (citation omitted).

¶68 We reiterate that the Montana Constitution is a limitation on the inherent, sovereign power of the state under our federal system, rather than a grant of, or enumeration of power, unless by express words it declares otherwise.[5] *Board of Regents of Higher*

[5] As stated by Revenue and Finance Committee in the Introduction to Proposed Article VIII: "From a pure, theoretical viewpoint, the Constitution does not have to say a thing about

*Ed. v. Judge* (1975), 168 Mont. 433, 444, 543 P.2d 1323, 1330; *State v. Toomey* (1958), 135 Mont. 35, 43, 335 P.2d 1051, 1055; *State ex rel. Tillman v. District Court* (1936), 101 Mont. 176, 181, 53 P.2d 107, 110. The Revenue and Finance Article of the Montana Constitution (Article VIII) contains no provision limiting the Legislature to any particular, mandatory system of statewide taxation. Rather, Article VIII, Section 1, provides only that "[t]axes shall be levied by general laws for public purposes." Unlike the 1889 Montana Constitution, the 1972 Constitution no longer contains the limitation of universal taxation. See *Bucher v. Powell County* (1979), 180 Mont. 145, 589 P.2d 660 (discussing Legislature's current broad discretion to exempt property); *but compare Cruse v. Fischl* (1918), 55 Mont. 258, 263, 175 P. 878, 880 (construing Article XII, Section 2, of the 1889 Constitution to prohibit any tax exemption not enumerated in the Constitution).[6] Because Montana's current Constitution no longer contains the limitation of universal taxation, neither is it necessary for it to enumerate specific tax exempt property, as was necessary under

taxation. That suggestion was made to the committee on at least two occasions. The reason is simple–the power to tax is an inherent power of the state, a power already possessed by the state without any grant of authority. Anything in a state Constitution on the subject of taxation is either redundant (reiterating a power already possessed by the state) or restrictive." Montana Const. Convention, *Revenue and Finance Committee Proposal on Const. Revision*, Vol. II, p. 579.

[6] Interpreting Article XII, Section 2, this Court stated in *Cruse v. Fischl*: "There cannot be a difference of opinion concerning the meaning of the language employed in section 2 . . . . The legislature may extend [tax] exemption[s] to the property enumerated, but it cannot go further or include any other." 55 Mont. at 263, 175 P. at 879-80.

31

Montana's 1889 Constitution.   Indeed, the exemptions listed in Article VIII, Section 5, of Montana's 1972 Constitution are permissive and non-exclusive, and with or without Section 5, there is no constitutional limitation on Montana's inherent sovereignty to choose which property to tax and which property to exempt from taxation.[7]   Unlike tax exempt property prior to 1972, all tax exemptions are statutorily based rather than constitutionally based.

---

[7] In addition to the clear language of Section 5, the Revenue and Finance Committee eliminated Article XII, Section 1, from Montana's 1889 Constitution, noting: "The state already possesses the power to levy particular kinds of taxes and license fees.  The Constitution does not need to list those tax programs.  The committee also did not feel that the Constitution should require taxation of all property.

"For 80 years, the Constitution required taxation of all property . . . .  The requirement of complete property taxation often encouraged dishonesty.  The proposed article removes those problems–the legislature shall decide what property to tax and how to tax it.  The legislature may decide that other types of taxation are more equitable and may reach kinds of property not touched by the property tax now."  Montana Const. Convention, *Revenue and Finance Committee Proposal on Const. Revision*, Vol. II, pp. 579-80.

¶69 The Appellants would have this Court construe the permissive language of Section 5(1)(c) to require that tax exempt property remain within a system of classification even in the unlikely event that the Legislature, exercising its inherent power, were to adopt an entirely different system of taxation. Indeed, the Appellants essentially argue that Section 5(1)(c) limits the Legislature to adopting a *de facto* classification system of taxation prior to exercising its power to exempt property from taxation.

¶70 To determine the meaning of a constitutional provision we employ the same rules of construction employed to construe statutes. *Great Falls Tribune Co., Inc. v. Great Falls Pub. Schs.* (1992), 255 Mont. 125, 128, 841 P.2d 502, 504. In construing Section 5(1)(c), this Court pays particular heed to the caveat that neither statutory nor constitutional construction should lead to absurd results if reasonable construction will avoid it. *Grossman v. Dept. of Natural Resources* (1984), 209 Mont. 427, 451, 682 P.2d 1319, 1332 (citation omitted). In arriving at an appropriate interpretation of the strictly permissive provision of Article VIII, Section 5, we conclude that, as the Legislature is not constitutionally limited to a classification system of taxation, neither does Article VIII, Section 5(1)(c), limit the Legislature to providing tax exemptions for property exclusively within a classification system. Consequently, absent an equal protection violation, there is no constitutional violation if and when the Legislature imposes taxation on property, via statute, and does so without classifying the property according to § 15-6-101, MCA. The

Legislature is limited in its power to exempt property from taxation only by the requirement to exempt via statute (Article VIII, Section 1), and in the requirement to impose taxation in a manner which does not violate equal protection and due process of the laws.

¶71 Accordingly, the decision of the District Court is affirmed.

¶72 **2. Did the District Court err in concluding that HB 28 and SB 412 did not violate the Appellants' rights to equal protection and due process of the law?**

¶73 Resolution of this issue involves a question of constitutional law. The standard for reviewing conclusions of law is whether they are correct. *Hampton v. Lewis and Clark County,* **2001 MT 81, ¶ 19, 305 Mont. 103, ¶ 19, 23 P.3d 908, ¶ 19 (citing *Lane v. Farmers Union Ins.,* 1999 MT 252, ¶ 15, 296 Mont. 267, ¶ 15, 989 P.2d 309, ¶ 15).** The constitutionality of a legislative enactment is prima facie presumed, and every intendment in its favor will be presumed, unless its unconstitutionality appears beyond a reasonable doubt. The question of constitutionality is not whether it is possible to condemn, but whether it is possible to uphold the legislative action which will not be declared invalid unless it conflicts with the constitution, in the judgment of the court, beyond a reasonable doubt. *State v. Lilburn* **(1994), 265 Mont. 258, 262, 875 P.2d 1036, 1039,** *cert. denied,* **513 U.S. 1078, 115 S.Ct. 726, 130 L.Ed.2d 630 (1995);** *Stratemeyer v. Lincoln County* **(1993), 259 Mont. 147, 150-51, 855 P.2d 506, 509,** *cert. denied,* **510 U.S. 1011, 114 S.Ct. 600, 126 L.Ed.2d 566 (1993) (citing *Fallon County v. State* (1988), 231 Mont. 443, 445-46, 753 P.2d 338, 339-40).**

¶74 Every possible presumption must be indulged in favor of the constitutionality of a legislative act. *Davis v. Union Pacific R. Co.* **(1997), 282 Mont. 233, 240, 937 P.2d 27, 31 (citing** *State v. Safeway Stores, Inc.* **(1938), 106 Mont. 182, 199, 76 P.2d 81, 84).** The party challenging a statute bears the burden of proving that it is unconstitutional beyond a reasonable doubt and, if any doubt exists, it must be resolved in favor of the statute. *Grooms v. Ponderosa Inn* (1997), 283 Mont. 459, 467, 942 P.2d 699, 703 (citing *Heisler v. Hines Motor Co.* (1997), 282 Mont. 270, 279, 937 P.2d 45, 50).

¶75 The Appellants' equal protection challenge is based upon the fact that HB 28 imposed, and SB 412 carried forth, a statewide 50 mill increase to provide state equalization aid for school funding on all taxable property in the state other than coal, oil and gas, thus subjecting classified property to a 95 mill statewide tax while continuing to burden coal, oil and gas with the previous 45 mill tax, plus an increase of less than 50 mills.[8] Utilizing such language as "school tax discrimination," "effective tax rate discrimination," "revenue neutrality," and "revenue shifting," the Appellants assert that the 50 mill increased burden on all taxable property in the state other than the extractive minerals, violates all classified property owners equal protection and due process of the law. This burden shift, the Appellants argue, is "invidious" and "constitutionally disproportionate in every sense" because the

---

[8] The tax increase on coal gross proceeds and net proceeds of oil and natural gas for school equalization aid consisted of the aforementioned LGST of 8.4 percent on oil, the LGST of 15.25 percent on natural gas, and the statewide levy of 5 percent on reported coal gross proceeds. *See* ¶¶ 13-14.

50 mill statewide increase "simply loaded up on classified property in a disproportionate sense" by not applying the state system of taxation, pursuant to § 15-6-101, MCA, to all taxable property.

¶76 The District Court granted summary judgment for the Respondents and against the Appellants, concluding that the Appellants did not meet the burden of demonstrating beyond a reasonable doubt that HB 28 and SB 412 lacked a rational basis for precluding coal gross proceeds and oil and gas net proceeds from the statewide mill increase.

¶77 The Appellants first assert that the District Court erred in applying the rational basis test because, they argue, without tax classification of coal, oil and gas pursuant to § 15-6-101, MCA, the rational basis tier of equal protection analysis does not apply. The Appellants direct this Court to *Montana Stockgrowers Ass'n v. Dept. of Revenue* (1989), 238 Mont. 113, 777 P.2d 285, to support this contention. However, as discussed below, *Montana Stockgrowers* does not support the assertion that the rational basis tier does not apply, and the Appellants do not suggest an alternative tier or alternative analysis to be applied in this instance. We acknowledge that this Court adopted a middle tier level of scrutiny in *Butte Community Union v. Lewis* (1986), 219 Mont. 426, 712 P.2d 1309, when analyzing Article XII, Section 3(3), of the Montana Constitution. *Lewis* did not involve a fundamental right or a suspect class, yet we adopted middle tier scrutiny in that instance "because although a right to welfare is not contained in our Declaration of Rights, it is sufficiently important that

36

Art. XIII, Section 3(3) directs the Legislature to provide necessary assistance to the misfortunate. A benefit lodged in our State Constitution is an interest whose abridgment requires something more than a rational relationship to a government objective." *Lewis,* 219 Mont. at 434, 712 P.2d at 1313.

¶78 As in *Montana Stockgrowers*, we decline to adopt middle tier scrutiny where there is no constitutional mandate or self-executing provision at issue which can be enforced by this Court. *Montana Stockgrowers*, 238 Mont. at 117, 777 P.2d at 288. In the instant case, the requirement of tax classification is statutory and is not a requirement based upon a provision in the Montana Constitution. There is, therefore, no reason to apply middle-tier scrutiny to the equal protection analysis. See *Lewis*, 219 Mont. at 434, 712 P.2d at 1313. In addition, both in its briefing and in oral argument, the Appellants concede that **the "class" against which the equal protection violation is claimed is "all classified property taxpayers" in the State of Montana.** As a classified property tax system is not a constitutional limitation, nor are "all classified property taxpayers" a suspect class, we conclude that the District Court did not err in adopting and utilizing the rational basis level of scrutiny.

¶79 To survive scrutiny under the rational basis test, a classification must be reasonable, not arbitrary, and it must bear a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike. *Montana Stockgrowers*, 238 Mont. at 117-18, 777 P.2d at 288 (citation omitted). Any classification is permissible which has a

37

reasonable relation to some permitted end of governmental action, and where there is a difference between various properties, the differences need not be great or conspicuous in order to warrant separate tax classification. *Montana Stockgrowers*, 238 Mont. at 118, 777 P.2d at 289 (citation omitted). "It is not essential to a valid classification [of property] that it depends upon scientific or marked differences in the subjects classified. It suffices if it is practical, and it is not reviewable unless palpably arbitrary." *Hilger*, 56 Mont. at 175, 182 P. at 484. Subject to these qualifications, the state has wide discretion, and if classification is neither capricious nor arbitrary, and rests upon real differences and some reasonable consideration of difference or policy, there is no denial of the equal protection of the law. *Allegheny Pittsburgh Coal Co. v. County Com'n of Webster County* (1989), 488 U.S. 336, 344, 109 S.Ct. 633, 638, 102 L.Ed.2d 688, 697; *Hilger*, 56 Mont. at 175, 182 P. at 484.

¶80 We first note that in the extensive briefing in the three consolidated cases and in oral argument, the Appellants suggested no specific level of constitutional scrutiny and offered nearly no equal protection and no due process analysis. The Appellants repeatedly place before the Court the undisputed fact that all classified property is taxed at a higher rate than coal, oil and gas for school equalization aid funding. Rather than providing a traditional constitutional analysis, the Appellants merely assert repeatedly that the different level of taxation is "constitutionally disproportionate in every sense" and that such

38

taxation is "invidious." The Appellants assert that the constitutional violation is simply "inherent" in two respects: first, because coal, oil and gas are not classified pursuant to § 15-6-101, MCA, and second, because 95 mills is 211 percent higher than 45 mills. In other words, in the language of the Appellants, the "refusal to apply the state tax law system [§ 15-6-101, MCA], implicates the Fourteenth Amendment," and 95 mills compared to 45 mills is "constitutionally disproportionate" and "invidious." This is the extent of the offered analysis.

¶81 Notwithstanding the limitations in their analysis, we will address the Appellants' concerns. The Appellants first direct this Court to *Larson v. State* (1975), 166 Mont. 449, 534 P.2d 854, for the proposition that the mere exclusion of the extractive minerals from this state's statutory classification system is, by itself, a violation of the Appellants' equal protection and due process rights. In *Larson*, the state attempted to tax property in Lewis and Clark County via an appraisal plan not applied to any other county in the state, resulting in higher assessed property values compared to similarly situated property in neighboring counties. This Court determined that the absence of a statewide plan, as required by statute, prevented the lawful implementation of a plan specific only to Lewis and Clark County. *Larson*, 166 Mont. at 455, 534 P.2d at 857.

¶82 Because *Larson* was decided based upon violation of a statute requiring a uniform method of appraisal, the Court declined to fully discuss what it defined as "patent" violations of the Montana

39

Constitution's equal protection and due process provisions. The statute at that time, § 84-429.12, R.C.M. 1947 (*see also* § 15-7-103(1)(b), MCA), required a general and uniform method of appraising city and town lots. Without constitutional analysis, the *Larson* Court simply stated that "Article II, Sections 4 and 17, 1972 Montana Constitution compel the same result, . . . [as] violations of statutory uniformity requirements generally result in violations of equal protection-due process requirements." *Larson*, 166 Mont. at 455, 534 P.2d at 857 (citation omitted).

¶83 *Larson* is of little precedential value, in this instance, because, unlike the statute requiring uniformity of assessment in *Larson*, § 15-6-101, MCA, although generally providing for taxation via a system of property classification, contains no internal uniformity requirement. Equally significant, the taxation of particular property via a more specific statute (i.e., the statutes providing for the taxation of oil, coal and natural gas), without statutory classification of that property is, without more, no constitutional violation provided that the Legislature's classification is practical and neither capricious nor palpably arbitrary. *Montana Stockgrowers*, 238 Mont. at 118, 777 P.2d at 289; *Hilger*, 56 Mont. at 175, 182 P. at 484.

¶84 Even similarly situated taxpayers may, for a short time, pay divergent taxes as part of a statewide reappraisal plan, which, without more, does not constitute an equal protection or due process violation. General adjustments as a substitute for individual reappraisal over a short period of time to equalize the

40

treatment of similarly situated property is permissible, provided that seasonable attainment of rough equality is achieved. *Roosevelt v. Dept. of Revenue*, 1999 MT 30, ¶ 45, 293 Mont. 240, ¶ 45, 975 P.2d 295, ¶ 45. But to avoid constitutional infirmity, the process of reappraisal must be part of a uniform statewide appraisal plan and must achieve seasonal attainment of equality in the tax treatment of similarly situated property owners, lest the state violate equal protection and due process of the laws. *Roosevelt*, ¶ 45; *Larson,* 166 Mont. at 455-56, 534 P.2d at 857-58.

¶85 We conclude, therefore, that the mere exclusion of coal, oil and natural gas from classification pursuant to § 15-6-101, MCA, combined with its taxation via separate statutory provisions, does not, by itself, constitute either an equal protection or due process violation.

¶86 We turn then, to the Appellants only other constitutional argument–that HB 28 imposes "invidious" and "disproportionate" taxation. The Appellants do not offer a definition or an analysis for what constitutes invidious tax treatment, other than suggesting that HB 28 and SB 412 somehow impose it. This Court adopted the "invidious" language in *Pacific Power & Light Co. v. Dept. of Revenue* (1989), 237 Mont. 77, 773 P.2d 1176, from the United States Supreme Court case of *Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 93 S.Ct. 1001, 35 L.Ed.2d 351. It appears from the analysis in *Lehnhausen* and from *Allied*, to which it cites, that "invidious" is synonymous with "palpably arbitrary," a standard used to determine whether legislation is rationally

related to its objective. *See Allied*, 358 U.S. at 527-29, 79 S.Ct. at 441-42, 3 L.Ed.2d 480, 485-87. From this then, it appears that the Appellants at least implicitly acknowledge that HB 28 need only be rationally related to its objective in order to survive constitutional scrutiny. However, the Appellants make no attempt to prove beyond a reasonable doubt that either HB 28 or SB 412 do not have such a rational basis.

¶87 The Respondents proffer that the Court need look no further than the Introductory clause to Chapter 11 of HB 28, which states that the intent of the Legislature was to "enhance equality of educational opportunity for students in the elementary schools and secondary schools of Montana by revising the school funding laws to provide greater equalization of funding available to school districts and to promote equalization of school district expenditures per student." The Respondents suggest that imposition of the LGST and the coal gross proceeds tax furthered this purpose by reducing disparity in school funding between resource-rich counties and counties without substantial coal, oil or gas production in the tax base.

¶88 The Respondents additionally offer the Minutes from the Senate Committee on Education and Cultural Resources, which indicate that the need to obtain a stable tax structure would be served by removing coal, oil and gas from the local mill levy structure and providing a statewide rate of taxation. The Minutes also reflect testimony that providing a statewide rate of taxation would make Montana's coal, oil and gas industries more competitive by

implementing a tax structure similar to that of other states. Minutes, Sen. Comm. on Educ. & Cult. Res., June 21, 1989.

¶89 However, as the Appellants provide no traditional constitutional analysis, do not attempt to prove beyond a reasonable doubt that HB 28 and SB 412 are not rationally related to a reasonable government objective, suggest no level of scrutiny apart from the rational basis test, and do not directly respond to the Respondents' proffered rationale for the constitutionality of each Bill, this Court needs to go no further than to presume the constitutionality of HB 28 and SB 412. ***Davis v. Union Pacific R. Co.* (1997), 282 Mont. 233, 240, 937 P.2d 27, 31 (citing *State v. Safeway Stores, Inc.* (1938), 106 Mont. 182, 199, 76 P.2d 81, 84); *State v. Lilburn* (1994), 265 Mont. 258, 262, 875 P.2d 1036, 1039; *Stratemeyer v. Lincoln County* (1993), 259 Mont. 147, 150-51, 855 P.2d 506, 509 (citing *Fallon County v. State* (1988), 231 Mont. 443, 445-46, 753 P.2d 338, 339-40).** Of legislative action, this Court asks not whether it is possible to condemn the action, but whether it is possible to uphold it, and we will not declare a statute invalid unless it conflicts with the constitution, in our judgment, beyond a reasonable doubt. *Davis*, 282 Mont. at 239, 937 P.2d at 30. This Court will not further develop the Appellants' nascent arguments nor further entertain the Appellants' equal protection or due process challenge.

¶90 We hold that the District Court did not err in concluding that HB 28 and SB 412 do not violate the Appellants' constitutional right to equal protection and due process of the laws.

43

¶91 Finally, the Appellants assert that the 1995 Act, continuing to levy 95 mills against classified property is not a "general tax law" as required by Article VIII, Section 1, of the Montana Constitution, which provides that taxes "shall be levied by general laws for public purposes." The Appellants direct this Court to *State ex rel. Woodahl v. Straub* (1974), 164 Mont. 141, 520 P.2d 776, for the proposition that levying taxes by general laws requires that a tax be applied equally to all property in the state. Thus, they argue that HB 28 is not a general law because it does not levy taxes for school equalization aid at the same rate on coal, oil and gas and on otherwise classified property.

¶92 Article VIII, Section 1, in requiring that taxes be levied by general laws, does not impose such a broad limitation as to require every tax law to be equally applied to all property in the state. Neither did this Court hold in *Woodahl* that a general law requires such uniform statewide taxation as argued by the Appellants. In *Woodahl* we noted that the legislation challenged therein was clearly a general law since it required all property to be levied at the same rate. *Woodahl*, 164 Mont. at 148, 520 P.2d 780. We did not, however, conversely state that a general law required a statewide uniform levy. Article VIII, Section 1, merely limits the Legislature by requiring the enactment of a general law, via statute, to authorize the levy of taxes. Clearly, the Legislature enacted SB 412 as a general tax law for the public purpose of school funding equalization aid. Such enactment does not exceed

44

the constitutional limitation placed upon the Legislature by Article VIII, Section 1.

¶93  **3.    Did the District Court err in its Findings of Fact and Conclusions of Law regarding Big Horn County's impairment of obligation of contract claim?**

¶94  In 1980, the voters in Big Horn County petitioned the County Commissioners for the issuance of County General Obligation bonds for the purpose of financing and constructing a retirement center and nursing home, and in November of 1980, the electors approved the measure.  Big Horn County subsequently issued General Obligation bonds in 1981 to fund the construction of the Heritage Acres Retirement Center, and issued County General Obligation Refunding bonds in 1984 to satisfy the indebtedness of the 1981 bonds.  The General Certificate for the bonds reflected that Big Horn County had approximately $109,319,684 of taxable value.  Coal gross proceeds constituted approximately $71,838,929 of the total taxable value.  The taxable value of Big Horn County was irrevocably pledged to the payment of the bonds, and it is this tax power, the County argues, that was rescinded by HB 28 when it imposed a fixed tax rate on coal gross proceeds and exempted the proceeds from local mill levies, thereby constituting impairment of the obligation of contract in violation of Article II, Section 31, of the Montana Constitution and Article I, Section 10 of the United States Constitution.

¶95  The District Court conducted a bench trial on this issue on September 14 and 15, 1999.  In March 2000, the District Court entered its Findings of Fact and Conclusions of Law, finding that

45

although the fixed tax rate imposed in HB 28 reduced the taxable value of Big Horn County by 73 percent from 1989 to 1990, the County also received substantially similar tax revenues from 1989 through 1995 as a result of taxes levied on coal production before and after the enactment of HB 28. The District Court concluded that, as Big Horn County's tax revenues were substantially similar before and after HB 28 and because the 1984 bonds were paid in full in December 1993, Big Horn County's obligation with its bondholders was not substantially impaired, nor did the enactment of HB 28 violate the Montana or the United States Constitution.

**¶96 The County asserts that the reduction in taxable value of Big Horn County constitutes an alteration of the contract's original terms, and that an alteration of this magnitude is conclusive that the bond contract was substantially impaired.**

¶97 The contract terms in question provide in part that:

> [T]he Board of County Commissioners will annually *levy an ad valorem tax on all of the taxable property in the County* sufficient to pay the interest hereon as it falls due and also to pay and discharge the principal of this Bond at maturity. [Emphasis supplied.]

The contract further specifies that:

> For the prompt and full payment of such principal and interest, as the same respectively become due, and full faith, credit, and taxing powers of the County have been and are hereby irrevocably pledged.

¶98 The County asserts that these terms were altered because *ad valorem* taxation could no longer be applied to coal. The County essentially argues that the "irrevocably pledged" language required the County's tax base to remain in relative stasis until the bonds were paid in full, and that HB 28 partly removed this "irrevocably

46

pledged" tax base.  This, the County contends, resulted in substantial impairment of the County's ability to perform according to the precise terms of the contract, even if full and timely payment was not impaired.  HB 28, the County argues, prevented it from performing according to the contract terms, and, apart from the successful repayment of the bonds, the reduced taxable value constituted unconstitutional impairment of the obligation of contract.

¶99   The County contends that the District Court **erred by incorrectly focusing on evidence that the bonds were, in fact, fully and timely paid, rather than focusing on the County's evidence that its taxable value had decreased, that coal taxes could not support the County's tax base, and that classified property was more heavily burdened.**

¶100 The Intervenors respond that the only salient facts necessary to a finding of no substantial impairment of contract are not in dispute.  They assert that both the 1981 and the 1984 Bonds were fully paid in a timely fashion and that Big Horn County received substantially similar tax revenues as a result of taxes levied on coal production before and after the enactment of HB 28.  The Intervenors further note that no bondholder ever challenged Big Horn County's payment of the bond proceeds and that the County does not dispute the District Court's factual finding that Big Horn County had sufficient tax revenue to pay its bonded indebtedness and that it did, in fact, pay its bonds in full.  The Intervenors

47

respond that, based upon these facts, there can be no substantial impairment of contract.

¶101 To reach a conclusion in this matter, however, this Court need not go beyond the fact that both the 1981 and the 1984 Bonds were fully and timely paid. It is axiomatic and this Court has consistently held that the existence of a justiciable controversy is a threshold requirement in order for a court to grant relief. *Shamrock Motors, Inc. v. Ford Motor Co.*, 1999 MT 21, ¶¶ 17-19, 293 Mont. 188, ¶¶ 17-19, 974 P.2d 1150, ¶¶ 17-19. If, because of intervening circumstances from the time the action is commenced, the district court is unable to grant meaningful relief or restore the parties to their original position, there no longer exists a justiciable controversy and the issue before the court is moot. *Shamrock*, ¶ 19; *Awareness Group v. Board of Trustees of School Dist. No. 4* (1990), 243 Mont. 469, 475, 795 P.2d 447, 450-51 (citations omitted). "To maintain an action the plaintiff must show that he has a right to be enforced or a wrong to be prevented or redressed, . . . but he is without standing where it is not shown that his rights have been, or are about to be, invaded." *Holt v. Custer County* (1926), 75 Mont. 328, 330, 243 P. 811, 811 (holding that the constitutionality of a statute can never be called in question by a person whose interests have not been, or are not about to be, prejudicially affected by its operation).

¶102 The test of whether a justiciable controversy exists contains three elements:

> First, a justiciable controversy requires that parties have existing and genuine, as distinguished from theoretical, rights or interests. Second, the controversy must be one upon which the judgment of the court may effectively operate, as distinguished from a debate or argument invoking a purely political, administrative, philosophical or academic conclusion. Third, [it] must be a controversy the judicial determination of which will have the effect of a final judgment in law or decree in equity upon the rights, status or legal relationships of one or more of the real parties in interest, or lacking these qualities be of such overriding public moment as to constitute the legal equivalent of all of them.

*Northfield Ins. Co. v. Montana Ass'n of Counties*, 2000 MT 256, ¶ 12, 301 Mont. 472, ¶ 12, 10 P.3d 813, ¶ 12 (citations omitted).

**¶103   As Big Horn County fully and timely paid the Bonds in this matter, we conclude that none of the above requirements exist and that the issue of impairment of obligation of contract in this matter presents no justiciable controversy and is therefore moot.**

¶104 The decision of the District Court is affirmed accordingly.

**¶105  4.   Did the Department of Revenue's activities in "Project 95" constitute legislation in contravention of the Separation of Powers Doctrine?**

¶106 In 1994 and 1995, the Department of Revenue engaged in a project – dubbed "Project 95"–wherein it spent more than a year working with representatives from large and small industry, county commissioners, school officials, and representatives from oil and gas companies to build a consensus on how best to achieve a simplification of the tax system as applied to oil and gas. The Department's work on Project 95 eventually became the basis for the Department drafting SB 412, which the 1995 Legislature eventually enacted as § 15-36-301, et seq., MCA, the Oil and Gas Production Tax Act.

¶107 The County asserts that neither the Legislature nor the Governor granted the Department of Revenue, as an executive agency, any power to conduct activities which would eventually result in a proposed Senate bill or the subsequent passage of the bill into law by the Montana Legislature, nor did either request the Department to conduct a study for this purpose. The County argues that the Department's activity in Project 95 was internally initiated rather than requested, and that the Department set out to change the tax law relating to oil and gas to serve, apparently, its own purposes. The County urges this Court to condemn the Department's actions under the Separation of Powers Doctrine of the Montana Constitution and to invalidate SB 412 because of the Department's participation via research and drafting.

¶108 The District Court determined that nothing in the Constitution precludes interim activity by citizens, executive agencies or other groups directed toward future legislative amendments, and that the Legislature, indeed, must rely upon such interim activities for the development and refinement of the bill it will consider in its short biennial session. The District Court concluded that executive involvement in the legislative branch is expressly required by the Montana Constitution, Article VI, Section 9, and that the Department did not exceed its power via Project 95.

¶109 The Respondents set forth a similar position, arguing that Article VI, Section 9, of the Montana Constitution provides the constitutional basis for the Department's activities in preparing SB 412. Article VI, Section 9, provides:

**Budget and messages.** The governor *shall* at the beginning of each legislative session, and may at other times, *give the legislature information and recommend measures he considers necessary.* The governor shall submit to the legislature at a time fixed by law, a budget for the ensuing fiscal period setting forth in detail for all operating funds the proposed expenditures and estimated revenue of the state. [Emphasis supplied.]

¶110 The Respondents argue that Project 95 was not a "legislative adventure" beyond the constitutional purview of the Department of Revenue, but rather, that the Department initiated activity in furtherance of the Governor's constitutional duty to propose legislation to the Legislature. The Respondents further direct this Court to § 15-1-203, MCA**, as the enabling statute for the Department's action, which provides:**

> **Study of other tax systems. The department may investigate the tax systems of other states and countries and formulate and recommend legislation for the better administration of the fiscal laws so as to secure just and equal taxation and improvement in the system of taxation and the economic expenditure of public revenue in the state.**

**The Respondents argue that the statute is an express legislative directive to the Department to engage in precisely the activity encompassed within Project 95 and the "shepherding" of SB 412 through the legislative process.**

¶111 The principle behind the separation of powers doctrine is that each branch of government is separate and distinct and is immune from the control of the other two branches of government in the absence of express constitutional authority to the contrary. *State ex rel. Morales v. City Comm'n of Helena* (1977), 174 Mont. 237, 240, 570 P.2d 887, 889 (citation omitted). **This doctrine is found in the**

51

**1972 Montana Constitution in Article III, Section 1, and is essentially identical to this state's previous separation of powers provision, Article IV, Section 1, in the 1889 Montana Constitution. Article III, Section 1, provides:**

> **Separation of powers. The power of the government of this state is divided into three distinct branches–legislative, executive, and judicial. No person or persons charged with the exercise of power properly belonging to one branch shall exercise any power properly belonging to either of the others, except as in this constitution expressly directed or permitted.**

¶112 Each branch of government is made equal, coordinate, and independent. However, as this Court previously stated in *Coate v. Omholt* (1983), 203 Mont. 488, 662 P.2d 591, by independence, "we do not mean absolute independence because 'absolute independence' cannot exist in our form of government. It does mean, however '. . . that the powers properly belonging to one department shall not be exercised by either of the others.'" *Coate,* 203 Mont. at 492, 662 P.2d at 594 (citing *State v. Johnson* (1926), 75 Mont. 240, 249, 243 P. 1073, 1077); *see also State ex rel. Hillis v. Sullivan* **(1913), 48 Mont. 320, 330, 137 P. 392, 395.**

¶113 That the government is separated into three distinct powers does not mean that there is or can be no connection or the slightest degree of dependence of one branch upon another. *Sullivan,* 48 Mont. at 330, 137 P. at 395. Although in theory the doctrine effects an absolute separation of the three branches, it has never been accepted as an absolute principle in practice. *See*

*State v. Johnson* (1926), 75 Mont. 240, 249, 243 P. 1073, 1077 (citations omitted).

¶114 **The doctrine is designed to prevent a single branch from claiming or receiving inordinate power, not to bar cooperative action among the branches of government.** *See Brown v. Heymann* **(N.J. 1972), 297 A.2d 572, 578 (citations omitted). Indeed, such cooperation between the branches has been correctly stated to be as essential in a free government as their separation.** *See City of Waukegan v. Pollution Control Board* **(Ill. 1974), 311 N.E.2d 146, 148 (citing** *Field v. People ex rel. McClernand* **(1839), 3 Ill. (2 Scam.) 79, 83-84);** *Heymann***, 297 A.2d at 578 ("the doctrine necessarily assumes the branches will coordinate to the end that government will fulfill its mission").**

¶115 It is the exclusive power of the Legislature to enact the laws of this state, and it is the exclusive power of the executive branch to enforce the laws as enacted, **subject only to the limitations which are contained in the Montana Constitution. The Montana Constitution does not provide that the legislative power of enactment must exclusively possess essential research, consensus building and the drafting of proposed bills, nor does it place a limitation upon the Executive branch which prevents it from providing such research, drafting and consensus building. Rather, as noted above, the Montana Constitution explicitly contemplates cooperation between the two branches in Article VI, Section 9. Although such cooperation does not need to be "enabled" by any particular constitutional or statutory provision, we note, however, that § 2-7-104, MCA, requires**

**the Department of Revenue to undertake precisely the type of study in which it engaged**

**in Project 95:**

> **Revenue studies – report to the governor and legislature. The director of revenue shall study fiscal problems and tax structures of state and local governments and submit the studies to the governor and, as requested, to the legislature, a legislative committee, or a member of the legislature.**

¶116 The statute requires mandatory submission of such studies to the Governor **without request, and mandatory submission to the Legislature upon request. It is of no constitutional import, contrary to the County's arguments, that the Department may take up and the Legislature receive such a study absent a request.**

¶117 Project 95 was not an encroachment by the executive branch into **powers exclusively held by the legislative, and the Department's actions in formulating SB 412 does not void the statute as properly enacted by the Legislature. The County does not suggest that the Department of Revenue itself enacted SB 412.**

¶118 We hold that the District Court did not err when it concluded that the Department of Revenue, in researching and drafting the proposed SB 412, did not violate the separation of powers provision of the Montana or United States Constitution.

¶119 The decisions of the District Court are affirmed in their entirety.

/S/ JIM RICE

We concur:

54

/S/ TERRY N. TRIEWEILER

/S/ PATRICIA COTTER

/S/ JIM REGNIER

/S/ W. WILLIAM LEAPHART

/S/ JAMES C. NELSON

/S/ THOMAS C. HONZEL, District Judge
sitting in place of Chief Justice Karla M. Gray