JOHN J. BROWN, CHARLES H. MARCIANTE AND NEW JERSEY STATE AFL–CIO, PLAINTIFFS, v. RONALD M. HEYMANN, COMMISSIONER OF THE NEW JERSEY STATE DEPARTMENT OF LABOR AND INDUSTRY, DEFENDANT.

Argued October 11, 1972—Decided December 4, 1972.

*Mr. Thomas L. Parsonnet* argued the cause for plaintiffs (*Messrs. Parsonnet, Parsonnet and Duggan* attorneys).

*Mr. Morton I. Greenberg,* Assistant Attorney General, argued the cause for defendant (*Mr. Jeffrey D. Doranz,* Deputy Attorney General, on the brief; *Mr. George F. Kugler, Jr.,* Attorney General of New Jersey, attorney).

The opinion of the Court was delivered by

WEINTRAUB, C. J. This case involves the Reorganization Plan for the Department of Labor and Industry adopted by the Governor under the Executive Reorganization Act of 1969, *N. J. S. A.* 52:14C-1 *et seq.* The complaint was filed in Superior Court, Chancery Division. In part the complaint attacks the mode of adoption of the plan, and since the reorganization act provides that a reorganization plan "shall have the force and effect of law" and shall be published with the public laws, *N. J. S. A.* 52:14C-7(c), the trial court viewed the complaint to be, in that respect, an action for the annulment of a law on the ground that it was not "duly passed" and for that reason to come within *N. J. S. A.* 1:7-1 *et seq.,* which provides for a summary proceeding in such matters before the Appellate Division. The trial court accordingly transferred the cause to the Appellate Division. We certified the matter before judgment in the Appellate Division.

The order of transfer to the Appellate Division was not limited to the issue of the regularity of the adoption of

the plan. Since all the issues can be resolved fairly in the present proceeding and no one questions this procedure, we will go directly to the merits.

I.

Plaintiffs attack the constitutionality of the reorganization act. Under that act, the Governor is authorized to prepare a reorganization plan and deliver it to both houses of the Legislature, *N. J. S. A.* 52:14C–4. A plan will take effect unless both houses shall within 60 days after such delivery pass a concurrent resolution "stating in substance that the Legislature does not favor the reorganization plan," *N. J. S. A.* 52:14C–7(a). The plan, if not thus disapproved, "shall have the force and effect of law" and will be published with the public laws, *N. J. S. A.* 52:14C–7(c). The reorganization act further provides that all acts or parts of acts "inconsistent * * * with a reorganization plan adopted hereunder, are, to the extent of such inconsistency, hereby repealed." *N. J. S. A.* 52:14C–11.

. Plaintiffs say that this method of adopting a reorganization plan violates the mandate of the State Constitution that a bill shall not pass unless a majority of all the members present in each house shall agree thereto, *Art.* IV, § 4, ¶ 6, and the further mandate that the bill shall then be presented to the Governor for his consideration, *Art.* V, § 1. ¶ 14. They contend also that under the reorganization act the Governor would exercise legislative power in violation of *Art.* III, ¶ 1, which reads:

"The powers of the government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution."

Plaintiffs do not say the delegation to the Governor of authority to adopt a reorganization plan is defective for lack of adequate standards for the exercise of the delegated

power. The standards are plainly sufficient. They are found in the statement of the purposes to be achieved, *N. J. S. A.* 52:14C–2(a), and in the specification of what a reorganization plan may do, *N. J. S. A.* 52:14C–4(a), and may not do, *N. J. S. A.* 52:14C–6(a). Rather plaintiffs contend the power to reorganize is nondelegable, that is, it must be exercised by the Legislature itself, and perhaps also that the reservation of the authority in both houses to disapprove a plan renders invalid a delegation of power which, but for that reservation, would be constitutionally permissible.

Our statute, as the statement annexed to the bill reveals, was patterned upon the federal Executive Reorganization Act, 5 *U. S. C. A.* § 901 *et seq.* There, too, the chief executive is authorized to prepare plans for reorganizations within his branch of government, to become effective unless disapproved by either house of the Congress rather than by both houses as under the New Jersey statute, 5 *U. S. C. A.* § 906(a).

The constitutionality of the federal act was sustained by three-man courts in *Isbrandtsen-Moller Co., Inc. v. United States,* 14 *F. Supp.* 407 (S. D. N. Y. 1936), affirmed on other grounds, 300 *U. S.* 139, 57 S. Ct. 407, 81 *L. Ed.* 562 (1936), and *Swayne & Hoyt v. United States,* 18 *F. Supp.* 25 (D. D. C. 1936), affirmed on other grounds, 300 *U. S.* 297, 57 S. Ct. 478, 81 *L. Ed.* 659 (1937). In the first cited case, the trial court readily found the standards were adequate to contain the exercise of the delegated power. As we have said, plaintiffs do not question the sufficiency of the standards in our statute. With respect to the issue before us, the federal court said in that case (14 F. Supp. *p.* 412):

"As it [the Congress] did not confer upon anyone functions it was bound to keep and exercise for itself, there was no failure to preserve the required separation of governmental powers."

In both cases, the United States Supreme Court found it unnecessary to pass upon the constitutional issue. The ques-

tion has not since been raised. It is safe to say the constitutionality of the federal statute is now accepted.

Apparently the only other opinion involving such statutes is *Opinion of the Justices*, 96 *N. H.* 517, 83 *A.* 2d 738 (Sup. Ct. 1950). There the Governor called for an advisory opinion as to the constitutionality of the New Hampshire executive reorganization act. The statute, as revealed by the opinion, was the same as ours in relevant aspects. The New Hampshire court split 3 to 2, the majority finding the statute to be invalid.

The majority opinion did not find the Legislature could not delegate to the Governor authority to adopt plans of reorganization. Rather the majority found there in fact was no delegation, saying (*pp.* 740–741) :

"We do not conceive that these provisions constitute a delegation of legislative authority to the Governor. Rather the authority is withheld entirely to the Legislature to determine whether the plans which he submits shall or shall not become law. They do not become law upon transmittal, nor by the lapse of time merely. Only the lapse of twenty-five 'legislative' days, coupled with inaction on the part of the Legislature, or its adjournment during the period, is sufficient under the act to give to the plan or plans the character of law. When filed they are no more than proposals, even though in the form of statutes. They become statutes only as the character of statutes is imparted to them by the Legislature."

Having found that the power to create an effective plan was not intended to be delegated, the majority concluded the constitutional process for legislating was reversed in that (1) under the statute as thus construed the Governor would propose legislative action rather than approve or disapprove action taken, and (2) whereas in the constitutional process of legislation the affirmative action of one house would be meaningless unless the other house agreed to the measure, here each house "has undertaken in advance to surrender to the other its constitutional authority to veto or refuse assent to action taken or approved by the other" (*pp.* 741–742). Referring to the federal reorganization act, the majority observed that the United States Supreme Court had not passed

upon its validity, and added that "the Federal Constitution contains no express requirement that each house of Congress shall have a negative on the other" (*p.* 742).

The majority opinion in the New Hampshire case does not support the proposition urged upon us that the power to adopt effective reorganization plans may not be delegated to the Governor. Rather the fatal defect there found was the absence of such a delegation. The dissenting opinion, on the other hand, found an intent to delegate that power, and the purpose of the delegation being stated and the prescribed standards being as definite as the subject would permit, the minority found the statute unobjectionable. The minority concluded the statutory provision which would block a plan if both houses resolved against it was not intended to make the end product an enactment by the Legislature itself but was "merely one of the checks or restraints upon the exercise of the subordinate legislative power delegated to the Governor" (*p.* 745).

We have no doubt that our Legislature did intend to delegate to the Governor the power to create an effective plan of reorganization, subject only to the disapproval by a concurrent resolution, rather than merely to authorize the Governor to propose a plan which would later be "enacted" into law by legislative inaction. Thus we do not find in the statute the conceptual difficulty which troubled the majority in the New Hampshire case.

Plaintiffs would distinguish the federal cases cited above upon still another approach. They point out that although the Federal Constitution vests the "legislative Powers" in the Congress, *Art.* I, § 1, and the "executive Power" in the President, *Art.* II, § 1, and the "judicial Power" in the Supreme Court and the inferior courts created by the Congress, *Art.* III, § 1, the Federal Constitution does not expressly call for a division of the total power "among three distinct branches" as does *Art.* III, § 1, of the State Constitution quoted above, or explicitly bar, as does that provision of the State Constitution, a person belonging to or constituting

one branch from exercising any of the powers properly belonging to either of the other branches. Plaintiffs say that our Constitution is therefore more restrictive and sufficiently so to prevent the delegation here involved even though a like delegation by the Congress may not offend federal organic law.

There is no indication that our State Constitution was intended, with respect to the delegation of legislative power, to depart from the basic concept of distribution of the powers of government embodied in the Federal Constitution. It seems evident that in this regard the design spelled out in our State Constitution would be implied in constitutions which are not explicit in this regard. See *Springer v. Philippine Islands,* 277 *U. S.* 189, 201–202, 48 S. Ct. 480, 72 *L. Ed.* 845, 849 (1928); *City of Zanesville v. Zanesville Tel. & Tel. Co.,* 64 *Ohio St.* 67, 59 *N. E.* 781, 782–783 (Sup. Ct. 1901); 16 *Am. Jur.* 2d, *Constitutional Law,* § 211, *p* 452; *Jaffe, Judicial Control of Administrative Action* (1965), *p.* 30. We have heretofore said our State Constitution is "no more restrictive" in this respect than the Federal Constitution. *Shelton College v. State Board of Education,* 48 *N. J.* 501, 518 (1967). Indeed in our State the judiciary has accepted delegations of legislative power which probably exceed federal experience. *Massett Building Co. v. Bennett,* 4 *N. J.* 53, 59–61 (1950); *In re Schragger,* 58 *N. J.* 274, 278–279 (1971). Hence the federal precedents cannot be discounted upon the thesis plaintiffs advance.

Chief Justice Marshall noted that "The line has not been exactly drawn which separates those important subjects, which must be entirely regulated by the legislature itself, from those of less interest, in which a general provision may be made, and power given to those who are to act under such general provisions to fill up the details." *Wayman v. Southard,* 10 *Wheat.* 1, 43, 6 *L. Ed.* 253, 263 (1825). If the line could be drawn, surely it would move in response to the growing complexity of government.

██ For present purposes, we think it enough to ask whether the statute so enhances the executive power as to threaten the security against aggregated power which the separation-of-powers doctrine was designed to provide. We must assume the Legislature found there is no such threat, and we must accept that evaluation unless it is plainly wrong. We cannot say it is. We note that the Governor is limited to rearranging what already exists. He is not empowered to decide what new or different authority should be vested in his branch of government. *N. J. S. A.* 52:14C–4(a) provides that the legislative objectives may be accomplished by transfer or abolition of the whole or a part of any agency or its functions; or by consolidation, merger or coordination of agencies or their functions; or by authorization of an officer to delegate his functions. Even within that prescribed area, the statute confines the delegated authority by providing that a reorganization plan may not create a new principal department in the executive branch or abolish a principal department or consolidate two or more of them; or extend the life of an agency; or authorize an agency to exercise a function not then expressly authorized by law; or increase the term of an office. *N. J. S. A.* 52:14C–6(a). We need not say a reorganization statute could not go further. We note the limitations in the statute to explain our finding that the statute as it stands is not vulnerable.

It was for the Legislature to decide whether to delegate the power or to attempt itself to initiate plans of reorganization. The Legislature declared the purposes to be achieved by reorganization plans "may be accomplished in great measure by proceeding under this act, and can be accomplished more speedily thereby than by the enactment of specific legislation." *N. J. S. A.* 52:14C–2(b). There being authority to delegate the legislative power, it does not rest with us to quarrel with the legislative decision to make the delegation.

██ Plaintiffs assail the wisdom of certain aspects of the reorganization plan here involved. But the constitutionality

of the statute does not turn upon whether a plan is wise or unwise in a judge's view. We cannot condemn the statute because mistakes might be made under its auspices. The responsibility for such policy decisions rests with the other branches of government, and this because of the very doctrine of separation of powers upon which plaintiffs rely.

It is well to repeat that while the doctrine of separation of powers is designed to prevent a single branch from claiming or receiving inordinate power, there is no bar to cooperative action among the branches of government. On the contrary, the doctrine necessarily assumes the branches will coordinate to the end that government will fulfill its mission. *In re Zicarelli,* 55 *N. J.* 249, 264–265 (1970), affirmed, 406 *U. S.* 472, 92 S. Ct. 1670, 32 *L. Ed.* 2d 234 (1972). The statute before us is not unique in thus delegating power to the head of another branch. The Congress has provided since 1789 that the federal judiciary shall have the power to prescribe rules of procedure. 28 *U. S. C. A.* §§ 2071, 2072, 2075; 18 *U. S. C. A.* §§ 3771, 3772. The constitutionality of that delegation was readily accepted long ago. *Wayman v. Southard, supra,* 10 *Wheat.* at 42–43, 6 *L. Ed.* at 262–263 (1825). Mention may also be made of *N. J. S. A.* 2A:84A–33 *et seq.,* which provides that the State Supreme Court may adopt rules dealing with the admission or rejection of evidence, subject to disapproval by joint resolution of the Legislature signed by the Governor, *N. J. S. A.* 2A:84A–36.

## II

The plan here involved reorganizes one of the principal departments of the executive branch. Plaintiffs would read the statute to authorize only a reorganization of an "agency" which, as defined in *N. J. S. A.* 52:14C–3(a), does not include a principal department. Thus plaintiffs contend "a reorganization plan must be limited to one agency alone at any time."

We cannot fathom a reason why the Legislature would choose that course. It would hardly be a route to a meaningful reorganization within the executive branch. At any rate, the statute is perfectly plain; it expressly contemplates that agencies may be consolidated or merged in whole or in part, *N. J. S. A.* 52:14C–4(a)(3), thus repelling the idea that a reorganization can relate only to a single agency. The breadth of the authorization within a principal department is emphasized by the prohibition in *N. J. S. A.* 52:14C–6 (a)(1) against "Creating a new principal department in the Executive branch, abolishing or transferring a principal department or all the functions thereof, or consolidating 2 or more principal departments or all the functions thereof." This limitation emphasizes the authority to reorganize a principal department.

### III

The remaining question is whether there was a failure to comply with the procedural requirements of the statute. Plaintiffs alleged (A) the Governor failed to deliver the plan to the Legislature in accordance with its terms, and (B) the plan was not published in the New Jersey Register within the time limit in the statute.

### A

*N. J. S. A.* 52:14C–4(b) provides that "The Governor shall deliver to the Senate and General Assembly on the same session day a reorganization plan." *N. J. S. A.* 52:14C–7(a) provides that "a reorganization plan shall take effect at the end of a period of 60 calendar days after the date on which the plan is transmitted to the Senate and General Assembly on a day on which both thereof shall be meeting in the course of a regular or special session unless, between the date of transmittal and the end of the 60-day period, the Legislature passes a concurrent resolution stating in substance that the Legislature does not favor the reorganization plan."

Thus the statute requires delivery to both houses on the same session day. Plaintiffs alleged delivery to the General Assembly on May 11, 1972, and delivery to the Senate on June 26, 1972. A trial of that factual issue was ordered. The trial court found the plan was delivered on May 11 to both houses. The finding is clearly correct. On that day the plan was delivered to and receipts signed by the individuals authorized to receive communications for the respective houses.

Some confusion ensued in the Senate, due apparently to the staff's unfamiliarity with the terms of the reorganization statute. When the plan was received on May 11, it was placed on the desk of the secretary of the Senate. He had discretion as to what communications should be announced on the floor. He initially did not appreciate what was involved; it was not until June 26 that he announced the receipt of the plan to the assembled Senators.

In his affidavit one plaintiff said he "caused to be prepared an Assembly Concurrent Resolution which became known as ACR-105" disapproving the reorganization plan. The resolution, which correctly recited delivery to both houses on May 11, was adopted by the General Assembly by voice vote on May 18. It was delivered to the Senate on June 15 and on that day was sent to a committee. It was still in committee on June 26 when the secretary of the Senate announced the receipt of the plan. Plaintiffs offered to prove that on June 26 a Senator called for the resolution but that the majority leader successfully objected to consideration on the ground that the plan had just been received. For present purposes we will assume the offered proof is in the case. On July 17 an effort to bring the resolution to a vote was blocked when the acting Senate President ruled the statutory period of 60 days (measured from May 11, the day of the delivery of the plan) had expired. On an appeal to the floor, the chair was sustained by a vote of 13 to 13.

Plaintiffs contend the delivery to the Senate on May 11 did not satisfy the statute. They would distinguish the word "deliver" in *N. J. S. A.* 52:14C–4(b) which requires the Governor to deliver the plan, from the word "transmitted" in *N. J. S. A.* 52:14C–7(a) which provides that "a reorganization plan shall take effect at the end of a period of 60 calendar days after the date on which the plan is transmitted to the Senate and General Assembly." Plaintiffs ask us to find that a communication is not "transmitted" to the Senate under its internal rules until the secretary of the Senate reads the communication on the floor and that the word "transmitted" in the statute was intended to take note of that view of the Senate rule. We see no substance to the proposition. The statute does not distinguish between delivery and transmittal. The words refer to the same ultimate event, the delivery of the plan to someone in the Senate authorized to receive it. The statute nowhere suggests that a delivery will be nullified by a clerical failure within one of the houses.

We do not review the ruling, as such, of the acting President of the Senate. Although our finding accords with his that delivery occurred on May 11, we do not undertake to interpret the rules of the Senate. Nor do we pass upon the decision of the chair on July 17 that a vote could not be had on the merits of the resolution. And the resolution not having been adopted, we do not have the question whether a vote on that day could have been deemed timely by reason of some mistake on the part of the Senate or its staff or by reason of some other circumstance.

B

We come then to the question whether there was a failure to comply with the statutory provision for the publication of the reorganization plan and whether the failure is fatal.

*N. J. S. A.* 52:14C–4, which provides in subsection (b) for delivery to the Senate and General Assembly, provides in subsection (c):

"A copy of the reorganization plan shall be transmitted to and filed with the Secretary of State for publication in issue of the New Jersey Register next following said filing."

The Governor filed the plan with the Secretary of State on May 11, the day of delivery to the Legislature. But again there was an administrative failure, for it was not until June 19 that the plan was delivered to the Director of the Division of Administrative Procedure who publishes the Register. It was too late for the June issue. The plan appeared in the issue of July 6 (4 *N. J. R.* 161–63), within the 60-day period and a few days short of its end. No one suggests publication was intentionally delayed; the explanation was that an official was not familiar with the provisions of the statute.

The issue, then, is whether the subordinate's failure to comply with the statute in this regard should defeat the plan. The statute is silent.

This provision of our statute departs from the federal reorganization act. The federal act provides that "A reorganization plan which is effective shall be printed (1) in the Statutes at Large in the same volume as the public laws and (2) in the Federal Register." 5 *U. S. C. A.* § 906(d). It is perfectly clear that the federal provision provides for publication *after* the reorganization plan becomes effective, that is, after the expiration of the 60-day period within which either house of the Congress may disapprove. The comparable provision in the State statute, *N. J. S. A.* 52:14C–7(c), provides only that:

"A reorganization plan which is not disapproved in the manner provided by subparagraph (a) of this section shall have the force and effect of law and the Secretary of State shall cause the same to be printed and published in the annual edition of the public laws under a heading of 'Reorganization Plans.'"

Thus in our statute so much of the federal provision as calls for publication in a Register was moved to another section, a section which deals also with the subject of the filing of the plan with the Legislature.

As we have said, the federal provision for publication in the Federal Register was not intended to give notice that a plan was awaiting congressional consideration. The question is whether our statute intends the publication to serve a notice function and to void a plan if the publication is not made in the first issue after delivery to the Legislature. There is no history to explain this departure from the format of the federal act.

One possibility is that the draftsman wanted to place with someone the responsibility for the delivery of the plan to the Register for publication, and having decided the Governor should initiate the process (although literally the section is silent as to who shall send the plan to the Secretary of State), decided it would be tidier to place in a single section a specification of all deliveries required of him. Upon that approach, the publication in the Register would remain a publication for record purposes only.

The other possibility is that the physical relocation of the provision in our statute was intended to transmute it into a provision for notice to the public of an opportunity to communicate with the members of the Legislature with respect to the merits of the plan. This, of course, is the position plaintiffs espouse. Several considerations militate against that view.

One is that a requirement for notice to that end would depart not only from the federal model but also from a policy embodied in the Administrative Procedure Act adopted one year earlier, which established the New Jersey Register, *N. J. S. A.* 52:14B–7(b). The Administrative Procedure Act, in providing for public notice by agencies of an intent to adopt, amend or repeal a rule, expressly excludes from the notice requirement a "rule prescribing the

organization or procedure of an agency," *N. J. S. A.*
52–14B–4(b). In other words, that statute requires notice
with respect to rules which affect members of the public.
A reorganization plan is more akin to a "rule prescribing
the organization or procedure of an agency" than to a rule
which would operate directly upon members of the public.[1]

More importantly, the statute before us nowhere states
an operative connection between the public notice and the
official action to which notice would be germane if an op-
portunity to be heard were intended. When notice is re-
quired with respect to the adoption of some legislative mea-
sure or with respect to an election, the time period is fixed
in relation to the time of enactment or the time of the elec-
tion. But here there is no stated connection between the
date of publication and the date of legislative action on a
plan. The 60-day period for legislative disapproval, con-
tained in still another section, *N. J. S. A.* 52:14C–7(a), is
expressly anchored to the date of delivery to the Legislature,
rather than to the publication in the Register. Nor would
the statute yield some fixed period of notice before legisla-
tive action by virtue of the operation of other provisions of
the act. There is no time prescription for the filing with
the Secretary of State, and even if we somehow inferred
that the filing had to be on the day of delivery to the Legis-
lature, still the period of actual notice would depend upon
the time of the publication of the next issue of the Register,
and would vary somewhere between 30 and 60 days. And
that period of notice would relate to the expiration of the

---

[1]This distinction appears also in *Art.* V, § 4, ¶ 6, of the State
Constitution which reads:

"No rule or regulation made by any department, officer, agency
or authority of this State, except such as relates to the organiza-
tion or internal management of the State government or a part
thereof, shall take effect until it is filed either with the Secretary
of State or in such other manner as may be provided by law. The
Legislature shall provide for the prompt publication of such rules
and regulations."

period within which the Legislature may act rather than to the commencement of the period or the date of actual legislative decision. Thus the publication might be of no avail as notice, for the Legislature, being free to act at any time within the 60-day period, could disapprove a plan even before the Register went to print. So, too, a resolution for disapproval could be defeated before publication, and although it may be assumed the resolution could be brought to another vote within the 60-day period, the efficacy of public notice would be diluted if the opportunity became only one to persuade legislators to back away from a position already taken in public. These considerations militate strongly against the thesis that publication in the Register was intended to give public notice as a condition precedent to the effectiveness of a reorganization plan.

In any event, if we found the publication in the Register was intended to provide the public an opportunity to address the legislators, the consequence of an untimely publication would not be to defeat the plan. The appropriate consequence would be to provide the public with that opportunity by extending the time for legislative disapproval, here, by a period of 30 days (the period of delay in the publication). As we have said, the Senate did not disapprove the plan within that further period.

Judgment for defendant.

*For judgment for defendant*—Chief Justice WEINTRAUB, Justices JACOBS, PROCTOR, HALL and MOUNTAIN, and Judges CONFORD and SULLIVAN—7.

*Opposed*—None.