895 A.2d 1128

IN THE MATTER OF P.L. 2001, CHAPTER 362.

RICHARD J. WILLIAMS, IN HIS OFFICIAL CAPACITY AS ADMIN-
ISTRATIVE DIRECTOR OF THE COURTS, PLAINTIFF–RE-
SPONDENT, v. THE STATE OF NEW JERSEY, DEFENDANT–
APPELLANT, AND PROBATION ASSOCIATION OF NEW JER-
SEY, AND PROBATION ASSOCIATION OF NEW JERSEY PRO-
FESSIONAL SUPERVISORS UNION, INTERVENORS–APPEL-
LANTS.

Argued January 4, 2006—Decided April 19, 2006.

*Andrea J. Sullivan* argued the cause for appellant (*Greenbaum, Rowe, Smith & Davis,* attorneys; *Paul A. Rowe,* of counsel; *Ms. Sullivan, Mr. Rowe* and *Emily A. Kaller,* on the briefs).

*David I. Fox* argued the cause for intervenors-appellants (*Fox and Fox,* attorneys; *Mr. Fox* and *Brendan E. Egan,* of counsel and on the briefs).

*Cynthia M. Jacob* argued the cause for respondent (*Fisher & Phillips* ; attorneys; *David J. Treibman,* on the briefs).

Justice ALBIN delivered the opinion of the Court.

Probation officers are part of the judicial branch of government and perform many duties that are essential to the mission of our courts, including supervising probationers in criminal and juvenile cases. As an arm of the court, they are required to avoid any perception of favoring one side or another or of being in league with any party, particularly law enforcement. To that end, the Administrative Office of the Courts (AOC) has prohibited probation officers from carrying firearms, making arrests, or joining fraternal police associations.

On January 7, 2002, the Legislature enacted the Probation Officer Community Safety Unit Act (Act), *L.* 2001, *c.* 362 (codified at *N.J.S.A.* 2B:10A–1 to –3, 2C:39–6(c)(17)). The Act creates in the heart of the judiciary a law enforcement unit comprised of no less than two hundred probation officers, who are authorized to carry firearms and arrest probation violators. The Act directs that the New Jersey Supreme Court promulgate rules for this new

armed unit within the State's judiciary, that probation officers assigned to the unit be trained by police authorities, and that the Administrative Director of the Courts report to the Legislature on the unit's effectiveness.

In this appeal, we must decide whether the Act interferes with this Court's exclusive constitutional authority over the administration of the courts under Article VI, Section 2, Paragraph 3 and Article VI, Section 7, Paragraph 1 of the New Jersey Constitution, and thus infringes on the powers of a separate and independent branch of government in violation of Article III, Paragraph 1. In the spirit of comity, we have accommodated legislative enactments touching on court administration, provided those enactments are not antithetical to the judiciary's core goals. Because the Act fatally compromises the independence of the judiciary, and hopelessly blurs the line between the role of our courts and law enforcement, we have no choice but to declare the Act unconstitutional.

## I.

### The Probation Officer Community Safety Unit Act

In a series of findings and declarations, the Legislature explained its reasons for enacting the Probation Officer Community Safety Unit Act:

a. The enforcement of probation sentences is crucial to the public safety;

b. Despite a drop in the overall crime rate, the number of dangerous and repeat offenders who are serving probation sentences has continued to rise in New Jersey;

c. The number of probationers who have violated the conditions of probation and have a warrant issued for their arrest has reached 15,000;

d. Probation officers working in the New Jersey state courts are not currently permitted to enforce these warrants;

e. Probation officers in other states are permitted to act as law enforcement officers.

[*N.J.S.A.* 2B:10A–1.]

As a result of those concerns, the Legislature "established within the Administrative Office of the Courts a 'Probation Officer Community Safety Unit,' " consisting overall "of no less than 200

probation officers." *N.J.S.A.* 2B:10A–2(a). The Act requires that a Community Safety Unit of at least five probation officers be assigned to every county. *N.J.S.A.* 2B:10A–2(b). The Act authorizes the probation officers in those units "to carry ... firearm[s]" and "to enforce warrants for the apprehension and arrest of probationers who violate the conditions of their probation sentence." *N.J.S.A.* 2B:10A–2(a).

In accordance with the Act, probation officers in the Safety Unit must undergo "law enforcement," "firearms," and "self-defense" training in courses administered by the Police Training Commission and must "annually qualify in the use of a revolver or similar weapon prior to being permitted to carry a firearm." *N.J.S.A.* 2B:10A–2(a), –2(c), –3; *N.J.S.A.* 2C:39–6(c)(17). The Act specifies that the law enforcement and self-defense training must be in accordance with rules adopted by the Supreme Court. *N.J.S.A.* 2B:10A–2(a), –3. The Act further specifies that probation officers in the unit must comply with rules to be adopted by the Supreme Court when they carry their firearms; arrest, detain, and transport probationers; and enforce the criminal laws. *N.J.S.A.* 2B:10A–2(a).

Last, Section 5 of the Act provides that "[t]he Administrative Director of the Courts shall report within 18 months of th[e] act's effective date to the presiding officers of the Senate and General Assembly regarding the effectiveness of the 'Probation Officer Community Safety Unit' ... in tracking and apprehending probationers." *L.* 2001, *c.* 362, § 5.

## II.

### *Procedural History*

The procedural history in this case is fully detailed in *Williams v. State (In re P.L.2001, Chapter 362)*, 375 *N.J.Super.* 485, 490–502, 868 *A.*2d 1034 (App.Div.2005). An abbreviated history here will illuminate the issues that must be addressed by this Court.

On April 23, 2002, Administrative Director of the Courts Richard Williams filed a complaint captioned "In the Matter of P.L. 2001, Chapter 362," seeking a judgment declaring that the Probation Officer Community Safety Unit Act violated the New Jersey Constitution by infringing on the exclusive powers of the judiciary under Article VI and by breaching the separation of powers under Article III. Specifically, the complaint alleged that the Act invests probation officers with law enforcement powers, which are incompatible with their judicial roles, and places them under the dual supervision of the Supreme Court and the Attorney General.

The trial court ordered the re-captioning of the complaint, naming Williams in his capacity as the AOC Director as plaintiff and the co-Presidents of the State Senate and the Speaker of the Assembly in their capacities as leaders of the New Jersey Legislature as defendants. Later, the court permitted the State of New Jersey to be named as defendant in place of the legislative defendants. The court also allowed the Probation Association of New Jersey and the Probation Association of New Jersey Professional Supervisors Union (PANJ) to intervene. *See Williams, supra,* 375 *N.J.Super.* at 491, 868 *A.*2d 1034. Throughout the litigation, despite its status as an intervenor, PANJ has been treated as a defendant. *See id.* at 532, 868 *A.*2d 1034 (noting that "PANJ was granted full party status" and that "any failure to designate it a defendant was of no practical consequence").

PANJ attempted to remove the case to the United States District Court for the District of New Jersey, but failed because of lack of federal subject matter jurisdiction. PANJ then moved to dismiss or to transfer the matter to a special master or a neutral third party, claiming that the judiciary should not be a judge in its own cause. PANJ also moved to compel arbitration, claiming in effect that its collective bargaining agreements with the judiciary required an arbitrator to resolve the constitutionality of the statute.

In denying PANJ's motions, the trial court declined the invitation to disqualify the entire judiciary on the ground of bias and

held that the doctrine of necessity required the state courts—the only forum capable of hearing the matter—to resolve the dispute. The court also refused to submit the determination of the Act's constitutionality to an arbitrator, finding that the "clear and unambiguous language of" the collective bargaining agreement did not call for an arbitrator to decide such an issue.

The trial court granted plaintiff's motion for summary judgment, declaring the Act unconstitutional because it "impermissibly intrudes and threatens the Judiciary's constitutional authority over the administration of the courts." The court found that the legislation interfered with the exclusive prerogatives of the Supreme Court by directing the judiciary to assign to the Probation Officer Community Safety Unit its probation officers to serve in a law enforcement capacity, by subjecting those officers to the supervision of the executive branch, and by requiring the Administrative Director of the Courts to report to the Legislature. The court determined that the Act not only clothed probation officers with a law enforcement authority inconsistent with their judicial role, but also conflicted with the Supreme Court's express policy prohibiting probation officers from carrying weapons in the performance of their duties. For those reasons, the court concluded that the Act could not be squared with the Supreme Court's broad constitutional authority over the administration of the court system.

In a comprehensive opinion, the Appellate Division affirmed. *Williams, supra,* 375 *N.J.Super.* at 534, 868 *A.*2d 1034. Because the Act contravened Supreme Court directives prohibiting probation officers from carrying firearms or acting in a law enforcement capacity, the panel determined that the Act "trammel[ed] upon the Supreme Court's plenary constitutional authority to make rules concerning the administration of the courts" and judiciary employees. *Id.* at 522, 868 *A.*2d 1034. The panel agreed with the trial court that the incompatibility of the Act with those Court directives compelled a finding that the Act was unconstitutional. *See id.* at 522–23, 868 *A.*2d 1034.

The panel rejected PANJ's argument that its collective bargaining agreement with the judiciary authorized arbitration of the Supreme Court's managerial prerogatives and the constitutionality of the Act. *Id.* at 523–27, 868 *A.*2d 1034. The panel ruled that only a court of competent jurisdiction can decide a statute's constitutionality and that such judicial review cannot be delegated to an arbitrator. *Id.* at 523, 868 *A.*2d 1034. Last, the panel rejected PANJ's contention that the entire state judiciary should have recused itself to avoid the appearance of bias, reasoning that " '[d]isqualification must yield to necessity where to disqualify would destroy the only tribunal in which relief could be had and thus preclude determination of the issue.' " *Id.* at 529, 868 *A.*2d 1034 (quoting *N.J. State Bar Ass'n v. N.J. Ass'n of Realtor Bds.,* 118 *N.J.Super.* 203, 209, 287 *A.*2d 14 (Ch.Div.1972)).

We granted both the State's and PANJ's petitions for certification. 183 *N.J.* 587, 874 *A.*2d 1106 (2005).

### III.

#### *The Supreme Court's Constitutional Authority to Manage the Judiciary*

This case presents an irreconcilable conflict between two branches of government, each claiming to possess the exclusive constitutional authority to dictate whether or not probation officers should be armed and make arrests. The Administrative Office of the Courts contends that the Probation Officer Community Safety Unit Act infringes on the Supreme Court's exclusive constitutional prerogative to manage judiciary personnel. On the other hand, defendants argue that the Act is a public safety measure rationally related to the criminal justice goal of incarcerating probation violators and therefore a traditional expression of legislative power. In that light, defendants maintain that the presumption of validity that attaches to all legislation has not been overcome.

## A.

In examining those respective claims, we begin with a bedrock principle of our federal and state constitutional forms of government—the separation of powers. *See Hayburn's Case,* 2 *U.S.* (2 *Dall.*) 409, 410, 1 *L.Ed.* 436, 437 (1792) (declaring that under "the Constitution of the United States, the government thereof is divided into three distinct and independent branches, and that it is the duty of each to abstain from, and to oppose, encroachments on either"); *Mt. Hope Dev. Assocs. v. Mt. Hope Waterpower Project, L.P.,* 154 *N.J.* 141, 150, 712 *A.*2d 180 (1998) (stating that "[t]he doctrine of separation of powers is fundamental to our State government"); *see generally The Federalist Nos. 47, 48, 51* (James Madison) (discussing vital importance of separation of powers to stable government and free society). That principle is codified in Article III, Paragraph 1 of the New Jersey Constitution:

> The powers of government shall be divided among three distinct branches, the legislative, executive, and judicial. No person or persons belonging to or constituting one branch shall exercise any of the powers properly belonging to either of the others, except as expressly provided in this Constitution.
>
> [*N.J. Const.* art. III, ¶ 1.]

The separation of powers doctrine is premised on the theory that government works best when each branch of government acts independently and within its designated sphere, and does not attempt to gain dominance over another branch. *See Gen. Assembly v. Byrne,* 90 *N.J.* 376, 381–83, 448 *A.*2d 438 (1982). Each branch of government operates within a greater framework of checks and balances that is intended to preserve our system of ordered liberty. *See The Federalist Nos. 47, 48, 51, supra; Knight v. City of Margate,* 86 *N.J.* 374, 387–88, 431 *A.*2d 833 (1981).

The drafters of the 1947 State Constitution were well aware "that in a representative democracy the Legislature would be capable of using its plenary lawmaking power to swallow up the other departments of the Government," unless there was a balance of powers among the three branches. *Gen. Assembly v. Byrne, supra,* 90 *N.J.* at 383, 448 *A.*2d 438 (internal quotation marks

omitted). The purpose of the separation of powers doctrine is not to create three "watertight" governmental compartments, stifling cooperative action among the executive, legislative and judicial branches. Rather, the aim is "to guarantee a system in which one branch cannot 'claim[ ] or receiv[e] an inordinate power.' " *Commc'ns Workers of Am., AFL–CIO v. Florio,* 130 *N.J.* 439, 450, 617 *A.*2d 223 (1992) (quoting *Brown v. Heymann,* 62 *N.J.* 1, 11, 297 *A.*2d 572 (1972)). Nevertheless, to assure the proper functioning of our constitutional scheme, we have held that "no deviation from the ... separation of powers [doctrine] will be tolerated which impairs the essential integrity of one of the [three] branches of government." *Massett Bldg. Co. v. Bennett,* 4 *N.J.* 53, 57, 71 *A.*2d 327 (1950).

### B.

To determine whether the Legislature has breached the separation of powers in this case, we must first look to the powers that the State Constitution confers on the judiciary to manage its personnel. Article VI, Section 2, Paragraph 3 provides that:

The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. [*N.J. Const.* art. VI, § 2, ¶ 3.]

Additionally, Article VI, Section 7, Paragraph 1 provides that:

The Chief Justice of the Supreme Court shall be the administrative head of all the courts in the State [and] shall appoint an Administrative Director to serve at his pleasure.
[*N.J. Const.* art. VI, § 7, ¶ 1.]

Those two provisions give the Chief Justice and the Supreme Court sweeping authority to govern their own house.

Two forms of rulemaking authority are conferred on the Supreme Court by Article VI, Section 2, Paragraph 3: the power to "make rules governing the administration of all courts" and the power to make rules—"subject to law"—governing "the practice and procedure in all such courts." Only rules concerning practice and procedure are qualified by the words "subject to law." In a tentative draft of the Judicial Article, the phrase "subject to law"

applied to the administration of the courts. That draft provided: "The Supreme Court shall, subject to law, make rules governing the administration and the practice and procedure in all the courts of the State." *Winberry v. Salisbury*, 5 *N.J.* 240, 258, 74 *A.*2d 406 (Case, J., concurring) (internal quotation marks omitted), *cert. denied*, 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950). In Article VI, Section 2, Paragraph 3's final form, however, "the words 'subject to law' were carefully preserved, but they were transferred so that they did not apply to the power of the court for self-administration but did apply to the control of practice and procedure." *Id.* at 258–59, 74 *A.*2d 406.

In the groundbreaking case of *Winberry v. Salisbury*, this Court held that "subject to law" meant substantive law, such as legislation and the common law, as opposed to pleading and practice. *Id.* at 247–48, 74 *A.*2d 406. In *Winberry*, we held that a court rule limiting the time in which to file an appeal fell within the Court's constitutional authority over practice and procedure and that a statute conflicting with that rule exceeded the Legislature's powers. *Id.* at 243, 255, 74 *A.*2d 406; *see also George Siegler Co. v. Norton*, 8 *N.J.* 374, 381–82, 86 *A.*2d 8 (1952) (noting that "statute [that is] wholly procedural in its operation" must yield to procedural rule promulgated by Supreme Court under its constitutional authority).

Contrary to defendants' argument, this case does not implicate the Court's rulemaking authority over "practice and procedure," a phrase, admittedly, not conducive to a facile definition.[1] Rules of

---

[1] The distinction between practice and procedure and substantive law has not always been easy to discern. *See Busik v. Levine*, 63 *N.J.* 351, 364, 307 *A.*2d 571 ("[I]t is simplistic to assume that all law is divided neatly between 'substance' and 'procedure.' A rule of procedure may have an impact upon the substantive result and be no less a rule of procedure on that account."), *appeal dismissed*, 414 *U.S.* 1106, 94 *S.Ct.* 831, 38 *L.Ed.*2d 733 (1973); *State v. Leonardis*, 73 *N.J.* 360, 374, 375 *A.*2d 607 (1977) ("[I]n many situations procedure and substance are so interwoven that rational separation becomes well-nigh impossible." (internal quotation marks omitted)). In the twilight area between practice and procedure and substantive law, this Court in the spirit of comity has attempted

practice and procedure in the courts cover a wide array of subjects from dismissal and directed verdict motions, *see George Siegler Co., supra,* 8 *N.J.* at 381–83, 86 *A.*2d 8, to the diversion of criminal defendants into pretrial intervention programs, *see State v. Leonardis,* 73 *N.J.* 360, 367–68, 375 *A.*2d 607 (1977). *See generally* Pressler, *Current N.J. Court Rules* (2006) (cataloging multitude of rules of practice and procedure that apply to court system). However elastic the phrase "practice and procedure" may be, it is the Court's power over administration that permits it to define the terms and conditions of employment of judiciary personnel and the functions they serve within the court system. *See, e.g., Passaic County Probation Officers' Ass'n v. County of Passaic,* 73 *N.J.* 247, 374 *A.*2d 449 (1977).

The Court's administrative authority is "far-reaching" and "encompasses the entire judicial structure [as well as] all aspects and incidents related to the justice system." *Knight v. City of Margate, supra,* 86 *N.J.* at 387, 431 *A.*2d 833; *see also* 2 *Proceedings of the Constitutional Convention of 1947,* at 1180 (vesting courts with "[e]xclusive authority over administration"). That authority includes not only "responsibility for the overall performance of the judicial branch," *In re Mattera,* 34 *N.J.* 259, 272, 168 *A.*2d 38 (1961), but also "all facets of the internal management of our courts." *Lichter v. County of Monmouth,* 114 *N.J.Super.* 343, 349, 276 *A.*2d 382 (App.Div.1971). The Supreme Court's administrative policies are pronounced through Court opinions, orders, rules, and directives. *See State v. J.M.,* 182 *N.J.* 402, 415–16, 866 *A.*2d 178 (2005).

Because their administrative rulemaking authority cannot be circumscribed by legislation, the Supreme Court and the Chief

---

to accommodate legitimate expressions of legislative authority and has shared responsibility with the Legislature in key areas of joint concern. *See, e. g., N.J.S.A.* 2C:43–12 to –22, *R.* 3:28, and *Leonardis, supra,* 73 *N.J.* at 374–76, 375 *A.*2d 607 (illustrating legislative and judicial cooperation in creation and implementation of pretrial intervention program—diversionary program for first-time, non-violent offenders).

Justice exercise exclusive and plenary power over the governance of the judiciary. *See Passaic County, supra,* 73 *N.J.* at 252, 374 *A.*2d 449 (stating that Court's authority over court administration is "unfettered" and "plenary," in contrast to its authority over practice and procedure, which is "subject to law" (internal quotation marks omitted)); *Mt. Hope Dev. Assocs., supra,* 154 *N.J.* at 150, 712 *A.*2d 180 ("Article VI, Section 2, paragraph 3 ... has been broadly defined to vest this Court with the exclusive jurisdiction to administer the courts of this State."); *CWA Local 1044 v. Chief Justice,* 118 *N.J.* 495, 497, 501, 509, 511 n. 1, 572 *A.*2d 613 (1990) (per curiam) (describing Court's power over administration of state court system as "exclusive").

## C.

▓ This Court's constitutional mandate to make administrative rules governing the court system brings within its compass probation officers, who historically have been considered an "integral part" of the judiciary. *Passaic County, supra,* 73 *N.J.* at 253, 255, 374 *A.*2d 449. In *Passaic County Probation Officers' Ass'n v. County of Passaic,* we held that "the control of probation officers and of the whole statewide system of probation, seemingly entrusted to the Judiciary by the terms of the Constitution, [cannot] be in any way diluted or modified by legislation[.]" *Id.* at 254, 374 *A.*2d 449. We reaffirmed this Court's authority not only to set the terms and conditions of employment of judiciary personnel, but also to determine their functions within the court system. *See id.* at 250–57, 374 *A.*2d 449. In that case, a Passaic County court directive extended the work hours of that county's probation officers. *Id.* at 249, 374 *A.*2d 449. Because the Passaic County court refused to negotiate a modification of working conditions with the probation officers' bargaining unit, the probation officers contended that the court's unilateral action violated the New Jersey Employer–Employee Relations Act. *See id.* at 250, 374 *A.*2d 449. We made clear that if a legislative enactment is at odds with the Court's "constitutional responsibility to superintend the

administration of the judicial system," the Court would be "constitutionally compelled" not to yield. *Id.* at 255, 374 *A.*2d 449. On the other hand, "[i]t has ... been the practice of this Court, with only occasional deviation, to accept and adopt legislative arrangements that have not in any way interfered with this Court's constitutional obligation." *Ibid.* Thus, as a matter of comity and commonsense, we have respected legislative enactments which have not directly conflicted or interfered with the operation of the judiciary. *Ibid.* In *Passaic County, supra,* out of respect for a legislative enactment and a constitutional provision that permits public employees to make known their grievances, we permitted the plaintiff bargaining unit to present its grievance to the County Court judges who were expected to engage in good faith discussions. *Id.* at 256–57, 374 *A.*2d 449.

 After *Passaic County, supra,* we have had occasion to restate that it is our policy to defer to legislation that touches on court administration "unless it interferes with the effective functioning of the courts." *CWA Local 1044, supra,* 118 *N.J.* at 501, 572 *A.*2d 613. In *Knight v. City of Margate, supra,* we addressed whether the New Jersey Conflicts of Interest Law, which severely restricted the dealings that members of the judiciary could have with casino licensees, violated the separation of powers. 86 *N.J.* at 377–78, 390–91, 431 *A.*2d 833. In that case, we again affirmed that the "constitutional authority of the Supreme Court over the judicial branch of government is preeminent." *Id.* at 389, 431 *A.*2d 833. We also recognized that the principle of separation of powers is not inconsistent with the notion of cooperation among the several branches toward the common goal of achieving responsible government. *Id.* at 388–89, 431 *A.*2d 833. In view of the interdependence of governmental powers, we have allowed for the exercise of legislative authority that serves a "legitimate governmental purpose" and "does not interfere with judicial prerogatives." *Id.* at 389–90, 431 *A.*2d 833. Stated differently, "the Supreme Court's ultimate power to accept or reject [legislative] action[ ] turn[s] upon the legitimacy of the governmental purpose

of that action and the nature and extent of its encroachment upon judicial prerogatives and interests." *Id.* at 391, 431 *A.*2d 833.

In *Knight, supra,* we found that the New Jersey Conflicts of Interest Law not only served "a significant governmental purpose," but also was consistent with ethical strictures in the Court's Canons of Judicial Conduct. *Id.* at 391–93, 431 *A.*2d 833. Because the legislation did not interfere with the Supreme Court's administration of the court system, we upheld its constitutionality as applied to judges. *Id.* at 394–95, 431 *A.*2d 833.

## IV.

### *The Constitutionality of the Probation Officer Community Safety Unit Act*

### A.

We next examine whether the Probation Officer Community Safety Unit Act is constitutionally compatible with this Court's policies governing the administration of the probation system. We begin with a brief discussion of probation.

Since the inception of the first probation statute in this State more than a century ago, *L.* 1900, *c.* 102 (repealed by *L.* 1906, *c.* 74),[2] probation officers have played an important role in our court system. *See* Charles Lionel Chute & Marjorie Bell, *Crime, Courts, and Probation* 73 (1956). The 1906 Probation Act provided for the appointment of probation officers by the judges of the county-based Court of Quarter Sessions. *L.* 1906, *c.* 75, § 1. Probation officers were entrusted with the responsibility of ensuring that a criminal defendant complied with a court-ordered probationary sentence. *See L.* 1906, *c.* 75, §§ 6–7 (describing duties of probation officers vis-à-vis probationers placed under their care by court). *See generally Adamo v. McCorkle,* 13 *N.J.*

---

[2] New Jersey was the fourth state in the nation to enact a statute providing for a system of probation. Charles Lionel Chute & Marjorie Bell, *Crime, Courts, and Probation* 73 (1956).

561, 564–65, 100 *A.*2d 674 (1953) (discussing history of early probation acts), *cert. denied,* 347 *U.S.* 928, 74 *S.Ct.* 531, 98 *L.Ed.* 1080 (1954).

The 1929 Probation Act, *L.* 1929, *c.* 156, is essentially intact today in our contemporary statutes, and is the foundation for our modern probation system. *See N.J.S.A.* 2A:168–5 to –13, 2C:45–1 to –4. Those statutes clearly establish that the probation department is under the authority and part of the judiciary. It is "[t]he Assignment Judge of the Superior Court in each county" who is vested with the power to appoint probation officers, including a chief probation officer, *N.J.S.A.* 2A:168–5, and to "fix" their salaries. *N.J.S.A.* 2A:168–8. Once appointed, the chief probation officer operates *"under the direction of the court"* and only may make "rules and regulations with respect to the management and conduct of the probation officers and other employees *as may be authorized by the Assignment Judge of the Superior Court."* *N.J.S.A.* 2A:168–7 (emphasis added). Our court rules are in accord with those statutes. *Rule* 1:34 classifies probation officers as "Supporting Personnel of the Courts" and *Rule* 1:34–4 provides that "the Chief Probation Officer of the county [is] responsible to and under the supervision of the judge designated by the Assignment Judge" and must comply with "applicable statutes, rules of the Supreme Court, and directives of the Chief Justice, the Administrative Director of the Courts, and the Assignment Judge of the County."

"The Probation Department in each county operates as an enforcement arm of the state judicial system." *Godfrey v. McGann,* 37 *N.J.* 28, 34, 179 *A.*2d 6 (1962). As such, probation officers carry out duties that are essential to the proper functioning of our court system. Those duties include preparing presentence investigation reports in criminal cases, *N.J.S.A.* 2C:44–6, 2A:168–11(a); furnishing criminal defendants with a statement of the conditions of their probation and supervising them while on probation, *N.J.S.A.* 2A:168–11(c), –11(e); conducting investigations and gathering information in matrimonial actions, including those

involving the custody of children, *N.J.S.A.* 2A:168–13, 2A:168–11(a); supervising "on request of the court" persons ordered to pay support or alimony in a matrimonial action, *N.J.S.A.* 2A:168–11(b); and collecting payments "from persons under their supervision . . . as may be ordered by the court." *N.J.S.A.* 2A:168–11(d).

Thus, it is "clear that probation officers play an important and indeed vital role in the administration of justice, both in the criminal and civil courts." *Passaic County, supra,* 73 *N.J.* at 253, 374 *A.*2d 449. The New Jersey Supreme Court has steadfastly maintained that probation officers must avoid any perception of partisanship in conducting court business. In furtherance of that policy, probation officers have been prohibited from performing traditional police functions or affiliating with law enforcement organizations. In 1974, the AOC advised probation officers that "[p]robation work is the guidance and assistance to persons under investigation and supervision, and not law enforcement." Administrative Office of the Courts, Directive No. 10–73 (May 15, 1974), http://www.judiciary.state.nj.us/directive/personnel/dir_10_73.pdf. AOC Directive No. 10–73 specifically barred probation officers from "carrying weapons in the regular performance of their work." *Ibid.* The directive recognized the dangers associated with some probationary work and suggested precautions to be taken "other than the carrying of firearms." *Ibid.* Probation officers were told that when undertaking a hazardous assignment, "[t]hey should consider traveling in pairs or requesting a police officer to accompany them on those occasions." *Ibid.*

In 1994, the Court was "asked to review its long-standing policy prohibiting probation officers from being members of law enforcement organizations," such as the Police Benevolent Association (PBA) and the Fraternal Order of Police (FOP). *In re Proceedings Concerning Probation Officers' Membership in Law Enforcement Organizations and Proposed Affiliation of PANJ with the N.J. State Policemen's Benevolent Ass'n, Inc.* (July 8, 1994) (per curiam) (slip ruling at 1), *digested in* 137 *N.J.L.J.* 1124, 1166 (July 18, 1994). We upheld that policy in an administrative ruling,

reasoning that any affiliation with law enforcement by probation officers would seriously compromise judicial independence. We explained:

> Our decision rests on the fundamental difference between probation and police organizations. Probation is an integral part of the judiciary; everything that probation does it does as an arm of the judiciary. Among other things, it is the entity that enforces judicial orders. Given the nature and functions of probation, it must be as impartial as the rest of the judiciary, totally so and scrupulously so. Probation cannot take sides any more than a court may, and cannot be perceived as taking sides any more than a court may. It is not pro-this or anti-that. . . . It has no more right to become allied with a public defender's office than with prosecutors or police. Probation represents no special interest in society and government but one: the courts.
>
> Police and police organizations have but one interest and one role: law enforcement. . . . The police stand firmly and properly on one side of the scales of criminal justice—the prosecution's side.
>
> Put simply, the functions of police and probation—one serving the prosecution the other serving the courts—are not only different, but incompatible. Separation of the two is essential to the impartiality of the probation function and to the integrity of the judiciary.
>
> [*Id.* (slip ruling at 3–4).]

In recognition of the unique role they play as agents of the judiciary, we noted that probation officers would be less likely to win the trust of those they supervise "if they were perceived in any way as 'law enforcers,' as 'police,' or if they acted as such." *Id.* at 18. At his best, a probation officer serves as "a probationer's supporter, counselor, . . . and sometimes even a role model . . . committed to the probationer's rehabilitation under court order, with the help of family, friends, and community, all in the effort to achieve a normal productive life." *Ibid.* Moreover, "[n]either the community groups, the family, nor the probationer would accept, work with, or be inspired by someone thought to have punishment as the main goal." *Ibid.* We thus concluded that if probation officers were allowed to identify themselves with the police, "the impartiality of the judicial branch of government" would be cast in doubt both "in fact and in appearance." *Id.* at 42.[3]

---

[3] PANJ sought relief in the United States District Court for the District of New Jersey to enjoin implementation of the Supreme Court's policy directive. *Kir-*

In rendering our decision, we again acknowledged the inherent dangers connected with some probation work and expressed support for measures that would enhance probation officers' safety. In that regard, we "strongly encourage[d]" cooperation between probation and police officers. *Id.* at 6. Following our ruling, the AOC issued Directive No. 6–97, prohibiting probation officers from becoming members of the PBA or FOP and requiring that probation officers who were already members of those organizations resign by June 30, 1997. Administrative Office of the Courts, Directive No. 6–97 (April 28, 1997), 148 *N.J.L.J.* 445, 535 (May 5, 1997), *available at* http://www.judiciary.state.nj.us/directive/per sonnel/dir_6_97.pdf.[4] Thus, through its decisions and directives, the Supreme Court has made clear that the special role of the judiciary in our constitutional scheme requires that there be no entangling alliances between law enforcement and judiciary employees.

### B.

Against the backdrop of those clearly enunciated judiciary policies, the Legislature passed into law the Probation Officer Community Safety Unit Act. By authorizing probation officers to be armed and make arrests, the Act is fatally at odds with this Court's administrative rules governing probation. Furthermore, the Act commands both the Supreme Court and the Administra-

---

*chgessner v. Wilentz,* 884 *F.Supp.* 901 (D.N.J.1995), *aff'd,* 92 *F.*3d 1171 (3d Cir.1996), *cert. denied,* 519 *U.S.* 1108, 117 *S.Ct.* 942, 136 *L.Ed.*2d 832 (1997). After dismissing PANJ's federal claims, the district court declined to invoke its supplemental jurisdiction over PANJ's state-law claims. *Id.* at 919.

4 At oral argument before this Court, plaintiff's counsel stated that the policy of the Administrative Office of the Courts prohibits probation officers from making arrests. Plaintiff's counsel added that if the probation officers of a county were not following that policy—as PANJ's counsel indicated was the case—those officers were acting "outside the authority of the Administrative Office of the Courts." *See also N.J.S.A.* 2B:10A–1(d) ("Probation officers working in the New Jersey State courts are not currently permitted to enforce [warrants for the arrest of probationers].").

tive Director of the Courts to collaborate in a legislative program in contravention of long-standing Court rules and directives. We cannot agree with defendants that allowing probation officers to carry guns and arrest those they supervise "will not impair the essential integrity of the Judicial branch." [5]

The Act creates a "Probation Officer Community Safety Unit" within the Administrative Office of the Courts, consisting "of no less than 200 probation officers," and requires that at least five probation officers in that unit be assigned to every county. *N.J.S.A.* 2B:10A-2(a), -2(b). As a result of the legislation, probation officers must be transferred from their present assignments into the new armed law enforcement unit. The Legislature requires the Supreme Court not only to reallocate judiciary personnel, but to effectuate an Act that abrogates the Court's own policy directives. *See N.J.S.A.* 2B:10A-2(a), -3 (providing that Supreme Court adopt rules in compliance with Act).

When the Legislature similarly attempted to dictate to the Governor how he should make staffing decisions, we held that the legislation violated the separation of powers doctrine of our State Constitution. *Commc'ns Workers of Am., AFL–CIO v. Florio*, 130 *N.J.* 439, 463–64, 617 *A.2d* 223 (1992). In that case, we declared that legislation countermanding specific executive decisions to reduce personnel amounted to unconstitutional "micromanag[ement]" and "regulat[ion of] the internal administration of a coordinate branch" of government. *Id.* at 461, 463, 617 *A.2d* 223. Such "a serious intrusion on the Governor's authority and ability to perform his constitutionally-delegated functions" had the clear capacity to "disrupt[ ] the balance between the" two branches. *Id.*

---

[5] In most states probation is part of the executive branch of government, either at the state or county level. *See generally* American Probation & Parole Ass'n, *Adult and Juvenile Probation and Parole National Firearm Survey 2001–2002* (March 2002), http://www.appa-net.org/information%2 0clearing%2 0house/survey/firearms.pdf. Thus, the practices in those jurisdictions in which probation officers are armed and act in a law enforcement capacity are of limited

at 461, 463–64, 617 *A*.2d 223; *see also Gen. Assembly v. Byrne, supra,* 90 *N.J.* at 378, 448 *A*.2d 438 (holding that legislative veto provision of Legislative Oversight Act, *L.* 1981, *c.* 27, violated separation of powers "by excessively interfering with the functions of the executive branch"). The Probation Officer Community Safety Unit Act interferes with the internal management of the judiciary in a way no less offensive than the unconstitutional legislation in *Florio* interfered with the executive branch.

As previously stated, with few exceptions, we have accepted and complied with legislation touching on court administration. *See Passaic County, supra,* 73 *N.J.* at 255, 374 *A*.2d 449. Accommodating the Legislature on those many occasions was compatible with the judiciary's core goals and furthered our common mission to give the State good and responsible government. But here, before passage of the Probation Officer Community Safety Unit Act, the Supreme Court made clear that the important judicial role played by probation officers in the court system could not be reconciled with arming them with guns, allowing them to execute arrest warrants, and permitting them to affiliate with law enforcement organizations. Despite those judicial policy pronouncements, the Legislature enacted a law authorizing probation officers to "carry ... firearm[s]" and "enforce warrants for the apprehension and arrest of probationers who violate the conditions of their probation sentence." *N.J.S.A.* 2B:10A–2(a). The Legislature also commanded those probation officers acting in a police capacity to undergo "law enforcement," "firearms," and "self-defense" training in courses administered by the Police Training Commission. *N.J.S.A.* 2B:10A–2(a), –2(c), –3. That Commission is part of the executive branch of government. *See N.J.S.A.* 52:17B–70 (creating Police Training Commission within Division of Criminal Justice in Department of Law and Public Safety). The Legislature, in effect, takes judiciary employees and places them under the sway of the executive branch in violation of the separation of powers and the Supreme Court's constitutional authority to govern its own house.

---

relevance to our constitutional system in which probation is part of the judicial branch.

Defendants argue that the Act is a valid exercise of the power of the Legislature to protect the health and safety of probation officers. However, this legislation is not designed to provide greater protection to probation officers in the field from criminal acts, but to convert a certain number of probation officers into armed law enforcement agents whose task it is to track down probation violators who have warrants for their arrest. This new role assignment for judiciary employees is more likely to place them in harm's way than enhance their safety. We are not unmindful that too many probation violators are on the loose. But it is the duty of the many municipal, county, and state law enforcement agencies to execute arrest warrants, including those of probation violators. Those are executive, not judicial, branch functions. It is not our place to pass judgment on the wisdom of legislation, and we do not do so here. It is our responsibility, however, to enforce the dictates of the Constitution and to restrain one branch of government when it oversteps its bounds and threatens the independence of another.

We acknowledge that there are statutes, predating the passage of the Probation Officer Community Safety Unit Act, that confer certain law enforcement powers on probation officers. *N.J.S.A.* 2A:168–11, which was enacted before the 1947 New Jersey Constitution, provides that "[p]robation officers shall have the powers of constables in the execution of their duties." A more recent statute provides that probation officers "upon request of the chief probation officer or otherwise having probable cause to believe that the defendant has failed to comply with a requirement imposed as a condition of the order or that he has committed another offense, may arrest him without a warrant." *N.J.S.A.* 2C:45–3(a)(2). Those statutes like all statutes are subordinate to the fundamental law expressed in the State Constitution. To the extent that those statutes are in conflict with the Supreme Court's exercise of its constitutional supervision of probation officers, they can be given no effect. Whatever constabulary duties probation officers may have had in 1929 when *N.J.S.A.* 2A:168–11 was

enacted, the role of probation officers is now clearly defined as a judicial one.

The Act conscripts the Supreme Court to violate its own long-standing policies by directing it to promulgate rules regulating how probation officers are to carry firearms and make arrests, and establishing the law enforcement training of those officers. The Act also requires the Administrative Director of the Courts to collaborate with the Legislature in a program that is contrary to the policy of his constitutional superior, the Chief Justice. The Director is compelled by the Act to report to the Legislature on how effective the probation officers have been "in tracking and apprehending probationers." *L.* 2001, *c.* 362, § 5. Those legislative commands to the Supreme Court and the Administrative Director of the Courts make an equal and independent branch of government subservient to the Legislature in violation of the separation of powers clause of our State Constitution, *N.J. Const.* art. III, ¶ 1.

 Because "every possible presumption favors the validity of an act of the Legislature," *N.J. Sports & Exposition Auth. v. McCrane,* 61 *N.J.* 1, 8, 292 *A.2d* 545, *appeal dismissed sub nom. Borough of E. Rutherford v. N.J. Sports & Exposition Auth.,* 409 *U.S.* 943, 93 *S.Ct.* 270, 34 *L.Ed.2d* 215 (1972), we will not declare void legislation "unless its repugnancy to the Constitution is clear beyond a reasonable doubt." *Harvey v. Bd. of Chosen Freeholders,* 30 *N.J.* 381, 388, 153 *A.2d* 10 (1959) (citing *Gangemi v. Berry,* 25 *N.J.* 1, 10, 134 *A.2d* 1 (1957)). Although principles of comity always animate this Court's review of legislation that affects judicial administration, the Probation Officer Community Safety Unit Act is completely irreconcilable with this Court's exclusive administrative authority over the State's court system under Article VI and the separation of powers under Article III. Our State Constitution, therefore, compels that the Act be declared invalid.

## V.

### The Role of Judicial Review

█ Throughout the life of this case, PANJ has argued that the constitutionality of the Probation Officer Community Safety Unit Act should be decided not by this State's judiciary, but rather by either an arbitrator or a special master. PANJ has contended that its collective bargaining agreements with the judiciary require submission of the Act's constitutionality to an arbitrator. We reject that argument for the reasons given by the Appellate Division. *See Williams, supra,* 375 *N.J.Super.* at 523–27, 868 *A.*2d 1034. We concur with the panel's conclusion that the arbitration agreement by its terms does not apply to the issue before us and that, in any event, the constitutionality of a statute cannot be decided by an arbitrator. *Ibid.* Only a court of competent jurisdiction has the power of judicial review and the solemn responsibility to strike down a statute that runs afoul of either our Federal or State Constitution. *See Wilentz v. Hendrickson,* 135 *N.J. Eq.* 244, 257, 38 *A.*2d 199 (E. & A.1944) (stating that reviewing constitutionality of legislation is "judicial function [that] is not open to debate").

█ Alternatively, PANJ maintains that an independent hearing officer should be chosen because this State's judges cannot be dispassionate in resolving a matter of self-interest to the judiciary. Here too we agree with the Appellate Division. *See Williams, supra,* 375 *N.J.Super.* at 527–30, 868 *A.*2d 1034. When a statute interferes with the administration of the judiciary, Superior Court judges and the Justices of this Court cannot escape their constitutional responsibility to decide the validity of the legislation. The rule of necessity forbids the disqualification of the entire judiciary from hearing a case even if there is some perception that the result may be tinged by self-interest. *See N.J. State Bar Ass'n, supra,* 118 *N.J.Super.* at 209, 287 *A.*2d 14. As the ultimate state tribunal authorized to decide the constitutionality of legislation, we can only hope that the public understands that judges, to the extent humanly possible, interpret the Constitution fairly, fearless-

ly, and independently, even when the issue touches on the judiciary's institutional concerns. *See, e.g., Pasqua v. Council,* 186 *N.J.* 127, 892 *A.*2d 663 (2006) (ruling against judiciary and holding that indigent parents facing incarceration at child support enforcement hearings are constitutionally entitled to appointed counsel); *R.M. v. Supreme Court,* 185 *N.J.* 208, 883 *A.*2d 369 (2005) (declaring unconstitutional Supreme Court rule that restricted client's right to disclose grievance filed against attorney).

## VI.

### *Conclusion*

For the reasons discussed, we affirm the judgment of the Appellate Division. Because the Probation Officer Community Safety Unit Act violates the Supreme Court's constitutional authority over the administration of the courts, and breaches the separation of powers, we are constrained to declare the Act void.

*For affirmance*—Justices LONG, LaVECCHIA, ZAZZALI, ALBIN, WALLACE and RIVERA–SOTO—6.

*Opposed*—None.